# No. 22-718

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**CARIBE BILLIE, QUINCY REEVES,** *individually and on behalf of all other similarly situated individuals,*

Plaintiffs - Appellees,

v.

**COVERALL NORTH AMERICA, INC.,**

Defendant - Appellant.

On Appeal from the United States District Court
For the District of Connecticut
Case No. 3:19-00092-JCH
The Honorable Janet C. Hall

## BRIEF OF DEFENDANT-APPELLANT
## COVERALL NORTH AMERICA, INC.

Norman M. Leon
**DLA PIPER LLP (US)**
444 West Lake Street, Suite 900
Chicago, Illinois 60606-0089
Tel. (312) 368-4000
norman.leon@us.dlapiper.com

Matthew J. Iverson
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Tel. (617) 406-6000
matthew.iverson@us.dlapiper.com

*Attorneys for Defendant-Appellant*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Coverall North America, Inc. states that it is wholly owned by CNA Holding Corporation, which is organized under the laws of Delaware and wholly owned by CNA Acquisition LLC, which is also organized under the laws of Delaware. CNA Acquisition LLC is wholly owned by Coverall Acquisition LLC of Delaware. Coverall Acquisition LLC is wholly owned by WCP Coverall Intermediate LLC, also organized in Delaware. WCP Coverall Holdings LLC, organized in Delaware, wholly owns WCP Coverall Intermediate LLC. WCP Coverall Holdings LLC is wholly owned by WCP Coverall TopCo LLC, which is organized in Delaware. WCP Coverall TopCo LLC has no parent corporation. No publicly held corporation owns more than 10% of the common stock in any of the above listed business entities.

i

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................. i

JURISDICTIONAL ISSUES ...................................................... 1

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ................................................... 2

STANDARD OF REVIEW ..................................................... 16

SUMMARY OF THE ARGUMENT ....................................... 17

ARGUMENT ............................................................ 22

I.   Reeves' Arbitration Has Not Been Had ......................................... 22

     A.   No Authority Suggests An Arbitration "Has Been Had" When A Party Voluntarily Withdraws From That Arbitration.......................................................... 23

     B.   The District Court Attempted To Take A "Narrow Path" To Lifting A Stay But Actually Built A Highway. ...... 29

     C.   The Minimum Requirements For Lifting A Stay, And Why Reeves Does Not Meet Them........................................ 39

II.   CNA Did Not Waive Its Right To Arbitrate. ................................. 42

     A.   The District Court's Legal Error: Failing To Pay An Opponent's Arbitration Costs Is Not Inconsistent With The Right To Arbitrate. ...................................................... 42

     B.   The District Court's First Factual Error: CNA Did Not Refuse To Advance Reeves' Share Of The Arbitrator's Compensation....................................................... 50

     C.   The District Court's Second Factual Error: CNA Did Not Act Inconsistently With Its Representation To The Court................................................................ 53

III.  CONCLUSION ............................................................ 54

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

AT&T Mobility LLC v. Concepcion,
131 S. Ct. 1740 (2011)........................................................................45

Billie v. Coverall North America, Inc.,
444 F. Supp. 3d 332 (D. Conn. 2020).......................................... *passim*

Brunner v. Lyft, Inc.,
No. 19-CV-04808-VC, 2019 WL 6001945 (N.D. Cal. Nov.
14, 2019).................................................................................... *passim*

CellInfo, LLC v. Am. Tower Corp.,
506 F. Supp. 3d 61 (D. Mass. 2020)............................................ *passim*

Cota v. Art Brand Studios, LLC,
No. 21-CV-1519 (LJL), 2021 WL 4864588 (S.D.N.Y. Oct.
15, 2021).................................................................................... *passim*

Dealer Computer Servs., Inc. v. Old Colony Motors, Inc.,
588 F.3d 884 (5th Cir. 2009)...............................................................48

Dobbins v. Hawk's Enters.,
198 F.3d 715 (8th Cir. 1999).................................................................1

Freeman v. SmartPay Leasing, LLC,
771 F. App'x 926 (11th Cir. 2019)............................................... *passim*

Howsam v. Dean Witter Reynolds, Inc.,
537 U.S. 79 (2002)........................................................... 26, 30, 48, 49

Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,
67 F.3d 20 (2d Cir. 1995) ....................................................................50

Lifescan, Inc. v. Premier Diabetic Servs., Inc.,
363 F.3d 1010 (9th Cir. 2004).......................................................28, 38

iii

<u>Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.</u>,
229 F.3d 397 (2d Cir. 2000) .............................................................. 16

<u>Moss v. First Premier Bank</u>,
835 F.3d 260 (2d Cir. 2016) ........................................................ 1, 16

<u>Pre–Paid Legal Servs., Inc. v. Cahill</u>,
786 F.3d 1287 (10th Cir. 2015)............................................... 1, 23, 26

<u>Sophinos v. Quadriga Worldwide Ltd.</u>,
No. CV-16-01273-MWF-MRWX, 2016 WL 10966561 (C.D.
Cal. Aug. 4, 2016)................................................................................ 48

<u>Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.</u>,
754 F.2d 457 (2d Cir. 1985) ............................................................... 50

<u>Thyssen, Inc. v. Calypso Shipping Corp.</u>,
310 F.3d 102 (2d Cir. 2002) ............................................................... 50

<u>Tillman v. Tillman</u>,
825 F.3d 1069 (9th Cir. 2016)..................................................... *passim*

<u>Union Cent. Life Ins. Co. v. Andraos</u>,
No. 1:09-CV-758, 2011 WL 6091771 (S.D. Ohio Oct. 21,
2011)...................................................................................................... 48

<u>Zhang v. Wang</u>,
317 F. App'x 26 (2d Cir. 2008) .......................................................... 49

**Statutes**

9 U.S.C. § 3 ............................................................................... 1, 27, 29

9 U.S.C. § 16(a)(1)(A).................................................................................. 1

28 U.S.C. § 1332 ........................................................................................... 1

16 C.F.R. § 436.1(k) ...................................................................................... 5

**Other Authorities**

AAA Rule 56 ................................................................................................ 54

iv

AAA Rule 57 ................................................................. *passim*

Fed. R. Civ. P. 41(b)............................................................. 54

EAST/193978178

## JURISDICTIONAL ISSUES

The District Court had diversity jurisdiction under 28 U.S.C. § 1332. This Court has jurisdiction under 9 U.S.C. § 16(a)(1)(A) because it is an interlocutory decision appealable as of right from a District Court order refusing to stay an action under 9 U.S.C. § 3 ("Section 3") of the Federal Arbitration Act ("FAA"). See Moss v. First Premier Bank, 835 F.3d 260, 264 (2d Cir. 2016) ("We have jurisdiction to review an order refusing a stay of any action under section 3 of the Federal Arbitration Act. 9 U.S.C. § 16(a)(1)(A). Here, the order appealed from lifted a prior stay under Section 3 and vacated a prior order compelling arbitration. Because the order appealed from was effectively one refusing a stay, we have jurisdiction to review it." Internal quotations omitted); see also Pre–Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1290 (10th Cir. 2015); Dobbins v. Hawk's Enters., 198 F.3d 715, 716 (8th Cir. 1999). Coverall North America, Inc. ("CNA") timely filed its notice of appeal on April 5, 2022.

## STATEMENT OF THE ISSUES

1.     Where a duly-appointed arbitrator has determined that the claimant failed to demonstrate an inability to pay his share of the

arbitrator's compensation, whether an arbitration has been "had" within the meaning of Section 3 when the claimant refuses to pay that share and voluntarily withdraws his demand for arbitration.

2.     Where a duly-appointed arbitrator has determined that the claimant failed to demonstrate an inability to pay his share of the arbitrator's compensation, whether a respondent waives its right to arbitrate when the claimant refuses to pay his share and the respondent fails to voluntarily pay the claimant's share on the claimant's behalf.

## STATEMENT OF THE CASE

The March 2022 Ruling[1] of the District Court (Hall, J.) lifting the stay of arbitration in this matter – which as far as CNA is aware is unprecedented – forces a party in arbitration to pay its adversary's arbitration costs whenever that adversary claims it cannot afford them, *even if, as in this case, the arbitrator rejects the adversary's claimed inability to pay*.  Any party who proactively refuses to pay its adversary's share of the fees in these circumstances risks being forced back into

---

[1] The Ruling, App. 512-41, is attached at page 1 of the Special Appendix at the end of this brief.  References to the Ruling appear as "Ruling at __."  References to other items in the Special Appendix appear as "SPA __."

2

litigation by a judge who, as in this case, second-guesses the arbitrator's determination, perhaps based on evidence the arbitrator never saw.

This case concerns plaintiff-appellee Quincy Reeves ("Reeves"), who tried three times to avoid his obligation to arbitrate by arguing he could not afford to pay for it. In his first attempt, Reeves tried to convince the District Court not to compel arbitration because arbitration would be too expensive. He failed in that effort because (a) he did not produce evidence supporting his claim, and (b) the District Court held that, in light of the arbitration agreement's delegation clause, the arbitrator had exclusive jurisdiction to determine whether Reeves could afford to pay. In his second attempt (during the ensuing arbitration), Reeves tried to convince the arbitrator he could not afford to pay his share of the arbitrator's compensation. This effort also failed for lack of evidence, although the AAA did present Reeves with alternatives to payment. Instead of pursuing any of those alternatives, Reeves voluntarily withdrew his arbitration demand. He then returned to the District Court and tried a third time to argue he could not afford arbitration, this time using new (but not newly discovered) evidence that the arbitrator had never seen.

3

This attempt succeeded, and the District Court elected to lift the stay in favor of arbitration as to Reeves.

The District Court gave two bases for its Ruling. First, it held that Reeves' arbitration had been "had in accordance with the terms of the agreement" under Section 3 because: (a) "the arbitration followed the terms of [Reeves'] Agreement and the AAA's Commercial Rules", and (b) Reeves "made a good-faith effort to arbitrate before facing costs that he has shown he could not afford." Ruling at 15. Second, the District Court held that CNA had waived its right to arbitrate because it had refused to advance Reeves' share of the arbitrator's compensation. Ruling at 28.

The District Court reached these conclusions even though:

1.     The arbitrator, who under the terms of the controlling agreement had exclusive jurisdiction to resolve all questions of arbitrability and waiver, had previously rejected Reeves' claim that he could not pay;

2.     Reeves voluntarily withdrew his arbitration demand even though alternative options to proceed without a deposit existed and had been presented; and

4

3.     Reeves withheld from the arbitrator much of the evidence he ultimately presented to the District Court to support his motion.

## **The Complaint and the Parties**

In January 2019, Reeves and his co-plaintiff Caribe Billie ("Billie") filed a complaint in the District Court alleging that defendant-appellant CNA had misclassified them as independent contractors.  App. 2.  CNA, however, has no relationship with Reeves or Billie.  App. 226.

CNA owns a distinctive system for developing and operating commercial cleaning businesses, which it licenses to others pursuant to master franchise (or subfranchisor) agreements.  App. 31, 66.[2]  CNA has provided one such license to R&B Services, Inc. dba Coverall of Connecticut & Westchester ("R&B"), a company unaffiliated with CNA and not a party to this litigation or the associated arbitrations. Under that license, R&B was granted the right to sell commercial cleaning

---

[2]  Under the Federal Trade Commission's Franchise Rule, which governs the sale of franchises in the United States, these master franchisees (or subfranchisors) are deemed franchisors in their own right.  See 16 C.F.R. § 436.1(k) (defining a "Franchisor" as "any person who grants a franchise and participates in the franchise relationship. Unless otherwise stated, it includes subfranchisors. For purposes of this definition, a "subfranchisor" means a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance.").

5

franchises using CNA's trademarks and system in a specified geographic area.  App. 62, 66, 226.

Reeves entered into a franchise agreement (the "Reeves JFA") with R&B in 2011.  App. 30.  CNA is not a party to the Reeves JFA.  <u>See</u> <u>id</u>. In 2018, Reeves assigned his franchise agreement to his limited liability company, Elite Work Enterprise LLC ("Elite").  App. 51-54.  Concurrent with that transfer, Reeves and Elite signed a release agreement, App. 58-61, containing an arbitration clause (the "Arbitration Agreement") that requires Reeves (as a principal of Elite) to arbitrate disputes with either R&B or CNA.  App. 59-61.  The Arbitration Agreement governs this proceeding, and it specifically states that disputes "concerning the validity, enforceability <u>or waiver</u> of … this Arbitration Agreement … shall be submitted to binding arbitration before the American Arbitration Association ("AAA")."  App. 59 (emphasis added).

**Reeves' First Try To Avoid Arbitration:  Reeves Fails To Prove**
**To The District Court That He Cannot Afford To Arbitrate.**

At the outset of the litigation, CNA moved to dismiss the complaint, or, in the alternative, to compel arbitration.  App. 22.  Plaintiffs resisted arbitration because, they claimed, the AAA's standard cost splitting rules in commercial cases – which were incorporated into the operative

6

arbitration agreements – rendered arbitration unaffordable and the Arbitration Agreement unconscionable. See Billie v. Coverall North America, Inc., 444 F. Supp. 3d 332, 349-50 (D. Conn. 2020). The District Court summarized the evidence Reeves submitted to support his claimed inability to pay as follows:

> Reeves estimates his monthly income from his cleaning work to be $4,000, and his wife's monthly income to be $2,500. He currently has $4,000 in savings. Reeves also notes that he "work[s] on cars on the side"; however, he does not disclose the income he derives from this business. And … Reeves provides no information as to his cash flow.

Id. at 352 (internal citations omitted).

During oral argument on the motion to compel arbitration, the District Court asked CNA's counsel about the arbitrator's compensation. CNA's counsel responded:

> If we're talking about the enforceability o[f] the delegation clause as the first hurdle, we have to get past, the question as to whether or not additional fees would somehow be an impediment to arbitration, that's a question for the arbitrator. I think the first hurdle we need to get over if the Court were to find the delegation clause unenforceable, I don't think there's a predicate for finding that on this record at all. And I will also make a representation to the Court. If the Triple A [American Arbitration Association] determines based upon an adequate showing from the plaintiffs that they cannot afford the cost of arbitration, we will front them.

App. 322 (Emphasis added).

7

The District Court ultimately rejected Reeves' argument, stayed the litigation, and compelled arbitration.  In doing so, the District Court held:

> Based on the record before the court, including the information (or lack thereof) regarding the size of the plaintiffs' claim against CNA, the fees plausibly expected, and the plaintiffs' financial situation, the court concludes that the plaintiffs have failed to demonstrate that the cost-sharing provision is substantively unconscionable….

Billie, 444 F. Supp. 3d at 353.

### Reeves' Second Try To Avoid Arbitration:  The Arbitrator Rejects Reeves' Claim That He Can't Pay His Share Of The Arbitrator's Compensation.

In the wake of the District Court's ruling, Reeves filed an individual arbitration demand with the American Arbitration Association ("AAA") which again raised a misclassification claim against CNA.  Billie filed a separate arbitration demand that is not a part of this appeal.[3]

Reeves first asked the AAA to waive the administrative fees associated with his demand.  In July 2020, Reeves filled out the AAA's

---

[3] In that arbitration, the Arbitrator concluded that Billie lacked the resources to pay his share of the arbitration costs. CNA advanced those costs.

8

form affidavit to request a waiver (the "July Waiver Affidavit," App. 500), and the AAA (not the arbitrator) granted his request.  See App. 413.

Reeves next filed a motion with the arbitrator asking him to apply the AAA's Employment Rules (which would require CNA to advance all the costs) to the arbitration instead of the AAA's Commercial Rules (which would require Reeves to pay half the arbitrator's compensation).[4] App. 438.  CNA opposed this motion because the Arbitration Agreement specified that the AAA's Commercial Rules would apply and because the case centers around the alleged misclassification of an individual with whom CNA has no relationship, employment or otherwise.

In support of his October 2020 motion, Reeves submitted a six-paragraph affidavit (the "October Affidavit") which attached, as its sole exhibit, a copy of the July Waiver Affidavit.  App. 497-501.  There were significant omissions in this evidentiary proffer.  For example, although the July Waiver Affidavit listed Reeves' gross monthly income

---

[4] Reeves also argued to the arbitrator that the AAA's Employment Rules should apply because Reeves was entitled to a preliminary finding that he was an employee and because an exception to the AAA's Commercial Rules should apply to his demand.  App. 438.  The arbitrator rejected both arguments and neither is material to this appeal.

9

as $1,861, it did not identify this income's source.  The source might have been Elite's franchise earnings, but the July Waiver Affidavit stated Reeves was "receiving unemployment insurance because some of [his] accounts cancelled during the pandemic," suggesting that Elite had at least temporarily ceased providing Reeves with income.[5]  App. 501.  The July Waiver Affidavit also stated that, in 2019, Reeves had "$15,578 in self-employment income through auto sales," but said nothing about how much income Reeves had earned from this source in 2020.  App. 500.

The October Affidavit also provided no data at all about Reeves' current income, either from Elite's franchise or in total.  App. 497-98.  The October Affidavit did mention, however, that Reeves was no longer on unemployment and that Elite had regained some cleaning customers App. 498, so the Arbitrator could reasonably infer that Reeves' income in October was higher, by an unknown amount, than it had been when Reeves filled out the July Waiver Affidavit.  Indeed, Reeves' income in October could have been significantly higher than in July, as the District

---

[5] CNA does not know what Elite earned from its franchise operations because it has no interactions with any of R&B's franchisees, including Reeves. App. 225-26.

10

Court (whose findings the arbitrator found "instructive" App. 439) had placed Elite's monthly income at $4,000. <u>Billie</u>, 444 F. Supp. 3d at 352.

What neither Affidavit provided, however, was any documentary evidence that could clarify or corroborate Reeves' income representations. And neither affidavit provided any information regarding Reeves' expenses. As a result, Reeves' proffer did not provide either the arbitrator or CNA with any way to verify or even calculate how much of the arbitrator's compensation Reeves could pay.

In the end, the arbitrator found that Reeves had failed to prove he was unable to pay his share of the arbitrator's compensation. In his December 8, 2020, decision, the arbitrator wrote:

> Mr. Reeves claims, without supporting evidence, that bearing one-half of the costs of the arbitrator's fees would make it prohibitively expensive, and so he would not be able to enforce his rights under Connecticut law.

App. 439. Regarding the cost of the arbitrator's compensation, the arbitrator held:

> [Reeves] further claims that "arbitration proceedings often cost tens of thousands of dollars in fees. He provides no support for this statement, and I cannot envision this matter costing anything approaching "tens of thousands of dollars."

11

Id.    The arbitrator also made clear that his determination on cost-splitting was preliminary.  As he explained in his decision:

> Moreover, the arbitrator has the authority to allocate expenses as he sees fit after hearing all of the evidence, so that the cost sharing provision may or may not reflect the final allocation of arbitral fees.

Id.

### Reeves Withdraws His Arbitration Demand.

On December 4, 2020, four days *before* the arbitrator issued his decision,[6] the AAA sent a letter (the "Deposit Letter") to both parties asking them to pay, by December 11, 2020, deposits sufficient to cover the arbitrator's compensation.  App. 441.  Although the District Court suggests in a footnote that this letter indicates CNA never paid its deposit, see Ruling at 18, n. 13, CNA did, in fact, pay its deposit on December 10, 2022.[7]  See SPA 53.

---

[6] The District Court appears to have confused this timeline, as the Decision states that the arbitrator issued his decision and the AAA sent the Deposit Letter "[s]hortly thereafter…."  Ruling at 5.

[7] The District Court's supposition regarding CNA's alleged non-payment was made *sua sponte*.  Plaintiffs never asserted that CNA had failed to pay its share of the arbitrator's compensation.

Reeves, however, did not. Although the Deposit Letter listed potential options for continuing the arbitration even if Reeves' deposit remained unpaid, including proceeding without Reeves' payment or replacing the arbitrator with one that would not require deposits, App. 441, Reeves pursued neither of these options, nor did he make a request to the Arbitrator to reassess or reapportion the deposits.[8] Instead, on December 10, 2022 – two days after the arbitrator decided Reeves' motion – Reeves' counsel notified the AAA that Reeves was withdrawing his arbitration demand. App. 503. On January 6, 2021, the AAA's case administrator sent the parties a letter (the "January 6 Letter") notifying the parties that Reeves' arbitration "is being closed as withdrawn as of the date of this letter." App. 444 (emphasis added).

The District Court described the termination of the arbitration differently. Citing the January 6 Letter, the Ruling states that "[w]ithout the requisite payment, the Arbitrator terminated the case as permitted

---

[8] The Ruling states that Reeves "made real attempts to secure funds from the outset of the dispute." Ruling at 23. The Ruling cites evidence to support this finding, and CNA is not aware of any evidence in the record that suggests that Reeves *ever* sought loans or any other funding source to pay his arbitration costs.

13

by [AAA] Rule 57." Ruling at 18. Nothing in the record, however, supports this finding. It was the AAA's case administrator, not the arbitrator, who sent the January 6 Letter, and the January 6 Letter mentions neither AAA Rule 57 nor any party's failure to pay. App. 444-45. Moreover, AAA Rule 57, which governs "Remedies for Nonpayment," SPA 32, does not permit a case administrator (or even an arbitrator) to immediately terminate an arbitration for non-payment. The Rule permits an arbitrator to *suspend* an arbitration if payment is not received, set a period during which the parties may make full deposits, and, if the deposits remain unpaid, terminate the proceedings after the suspension period has run. See AAA Rule 57 (e)-(f). SPA 32-33. None of this happened. Instead, as the January 6 Letter states, the AAA's case administrator closed the arbitration because Reeves withdrew his demand. App. 444.

In the wake of the arbitrator's decision, neither the AAA nor Reeves asked CNA to pay any portion of Reeves' share of the arbitrator's compensation. Nor did CNA proactively volunteer to do so. This was entirely consistent with CNA's representation to the District Court that it would pay Reeves' share of the arbitration costs "[i]f the Triple A

14

determines based upon an adequate showing from the plaintiffs that they cannot afford the cost of arbitration," App. 322, because the AAA, through its appointed arbitrator, had *rejected* Reeves' claim that he could not afford to pay, App. 439.

### Reeves' Third Try To Avoid Arbitration: Back To District Court

On March 9, 2021, Reeves filed a motion with the District Court seeking to lift the stay.[9] App. 371. Reeves' Motion did not attach the October Affidavit he had provided to the arbitrator. Instead, Reeves' Motion attached a brand new four-page affidavit (the "New Affidavit"). App. 458-61. The New Affidavit contained new representations about Reeves' income (some of which were inconsistent with or contradicted those made to the AAA) as well as entirely new representations about Reeves' expenses. The New Affidavit also attached nine exhibits that neither the arbitrator nor CNA had ever seen. App. 462-79. Based on this new record, Reeves argued to the District Court:

---

[9] Reeves' Motion also sought relief on behalf of non-party Veronica Flores, another R&B franchisee. App. 371-72. Ms. Flores had also filed an arbitration demand against CNA, refused to pay her share of the arbitrator's compensation, and then ended her arbitration. The District Court held it lacked jurisdiction over Ms. Flores as she was a non-party to the litigation. Ruling at 8-9.

… there can no longer be any doubt that the cost-splitting provision in Coverall's arbitration agreement is unconscionable and unenforceable. Coverall has attempted to deploy that provision to prevent Plaintiffs from pursuing claims against it in any forum, whether court or arbitration. Thus, this Court should rule the provision unenforceable and reinstate Plaintiffs' claims in court.

App. 372.

On March 22, 2022, the District Court issued the Ruling lifting the stay as to Reeves.[10]  Ruling at 30.  On April 5, 2022, CNA timely filed a notice of appeal.  App. 542.

## STANDARD OF REVIEW

This Court reviews de novo the District Court's order lifting a stay of an action under Section 3.  <u>Moss v. First Premier Bank</u>, 835 F.3d 260, 264 (2d Cir. 2016) ("Because the order appealed from 'was effectively one 'refusing a stay',' we have jurisdiction to review it [. . . .] We review the district court's order de novo."); <u>see also</u> <u>Mediterranean Shipping Co. S.A. Geneva v. POL-Atl.</u>, 229 F.3d 397, 402 (2d Cir. 2000) ("We review <u>de novo</u> the denial of a motion to stay an action pending arbitration.")

---

[10] The District Court further held that it would not rule on the unconscionability of the cost-splitting provision of the arbitration agreement "as that issue ha[d] already been addressed twice: once by [the District Court], <u>see</u> <u>Billie v. Coverall N. AM., Inc.</u>  (<u>Billie I</u>), 444 F. Supp. 3d 322, 349-353 (D. Conn. 2020), and once in arbitration."  Ruling at 9-10.

16

## SUMMARY OF THE ARGUMENT

The District Court lifted the stay of arbitration in this case because it held: (a) the arbitration had been "had" under Section 3, Ruling at 14-24, and (b) CNA was in "default" under Section 3 because it waived its right to arbitrate, id. at 24-28. Both holdings were erroneous.

The District Court's holding that the arbitration had been "had" under Section 3 is the product of several errors. The most prominent is the District Court's determination that the arbitration was terminated in accordance with the parties' agreement—and had therefore been "had"—because "the Arbitrator terminated the case as permitted by [AAA] Rule 57." Ruling at 18. This finding was simply wrong—the record makes clear that the arbitration ended because Reeves unilaterally withdrew from the proceedings—and that error undercuts the entire Ruling. No authority suggests a District Court can lift stay in favor of arbitration at the request of a party who withdrew from that arbitration. Consistent with the principle that a stay may be lifted only when a party is deprived of the opportunity to proceed with arbitration, the courts that have considered this question have held that a stay can be lifted only after (a) the requesting party exhausts all available options

17

for proceeding, and (b) *the arbitrator* terminates the proceeding. Neither of these things happened here. (Pp. 22-29.)

In its attempt to craft a rule that would allow it to lift the stay in this case, the District Court transformed the narrow path followed by prior courts into a broad thoroughfare that parties forced into arbitration can use to return to court at will. The District Court held that it could lift the stay if "two conditions have been met: (a) the arbitration—in conformity with procedures laid out in the relevant agreement and arbitral rules—began, transpired in part, and concluded when one party's[sic] failed to pay; and (b) the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration." Ruling at 15. But the District Court's standard affords the arbitrator no role in this process (and, indeed, the District Court ignored the arbitrator's determinations in this case). In this way, the District Court's rule disregards settled Supreme Court precedent that *arbitrators*, not courts, decide in the first instance when and how an arbitration should end. None of the cases upon which the District Court relied support this result. (Pp. 29-39.)

What the applicable precedents do establish is that a party seeking to lift an arbitral stay must, at a minimum, (a) exhaust all avenues for relief available from the arbitral authority, (b) present all its hardship evidence for that authority's consideration, and (c) allow that authority to determine whether, in light of that evidence, the arbitration's costs should be reassessed, or (if no reassessment is warranted) whether the arbitration should be terminated for nonpayment. Reeves, however, did none of these things and made none of these showings. He just withdrew from the arbitration, and he did so before the arbitrator could consider any of several available alternatives that would have allowed Reeves to continue to arbitrate despite his professed inability to pay his deposit. Moreover, Reeves withheld evidence from the arbitrator about his financial situation that he later presented to the District Court, even though the arbitrator made clear he would consider any additional evidence that Reeves might present. This was not good faith. It was gamesmanship designed to put Reeves back in the forum he wanted. (Pp. 39-42.)

The District Court's holding that CNA was in default because it waived its right to arbitrate is also predicated on a string of errors. The

19

first was the District Court's holding that a party "acts inconsistently with its contractual arbitration right" whenever it "seeks to compel arbitration" and "then refuses an opportunity to advance costs to ensure that the arbitration takes place…." Ruling at 26. Under this rule, all a party compelled to arbitration need do to avoid a contractual cost-splitting obligation is claim it cannot pay. Once that claim is made, the party who compelled arbitration *must* pay its opponent's fees. That is true even if, as in this case, the arbitrator concludes that the party failed to establish an inability to pay. If it fails to do so, it waives its arbitration rights. Not surprisingly, this was not the holding of <u>Cota v. Art Brand Studios, LLC</u>, No. 21-CV-1519 (LJL), 2021 WL 4864588 (S.D.N.Y. Oct. 15, 2021), on which the District Court relied in reaching its holding. The court in <u>Cota</u> held that a party had waived its right to arbitration because the arbitrator in that case had given the waiving party two alternatives—pay its opponent's share of the arbitration costs or allow the arbitration to end—and the waiving party chose the latter. <u>Id.</u> at *10. That did not happen here. Indeed, it *could not* have happened here, because Reeves withdrew his arbitration demand rather than ask for relief from his deposit requirement. If that were not enough, the

20

District Court's holding ignores both controlling Supreme Court precedent and the Arbitration Agreement's terms, *both* of which require that the arbitrator, not the District Court, decide whether CNA waived its right to arbitrate. (Pp. 42-50.)

The District Court's next two errors were factual. First, although the District Court held that CNA waived its right to arbitrate because it "refus[ed] to advance Reeves' portion of the arbitrator's compensation," Ruling at 25, that never happened. Advancing an expense connotes an expectation of repayment, and all Reeves did was ask the arbitrator to declare the AAA's Commercial Rules cost-splitting provisions unconscionable. The arbitrator never suggested that CNA should pay Reeves' share of the arbitrator's compensation, or that CNA could somehow recover that payment if it were made. And Reeves never suggested to either CNA or the arbitrator that he would *ever* pay his share of the arbitrator's compensation under any circumstance. (Pp. 50-52.)

Second, the District Court erroneously concluded that, in "failing" to advance the costs, CNA had acted contrary to its counsel's representation at argument that "[i]f the Triple A determines based upon

21

an adequate showing from the plaintiffs that they cannot afford the cost of arbitration, we will front them." App. 322. CNA did not volunteer to front Reeves' share of the arbitrator's compensation because the arbitrator concluded that Reeves had *not* made an adequate showing that he was unable to pay his share. CNA never represented that it would pay Reeves' share of the costs if Reeves *failed* to convince the AAA he could not pay, and the District Court's finding that CNA acted contrary to its representation was clear error. (Pp. 52-54.)

## ARGUMENT

## I. REEVES' ARBITRATION HAS NOT BEEN HAD

The District Court held that Reeves' arbitration had been "had in accordance with the terms of the agreement" under Section 3, and that the stay could therefore be lifted, because: (a) "the arbitration followed the terms of [Reeves'] Agreement and the AAA's Commercial Rules", and (b) Reeves "made a good-faith effort to arbitrate before facing costs that he has shown he could not afford." Ruling at 15.

The District Court's conclusion is premised on several factual errors, one of which undercuts its primary legal conclusion. On page 18 of the Ruling, the District Court held that the arbitration was terminated

22

in accordance with the parties' agreement—and had therefore been "had"—because "the Arbitrator terminated the case as permitted by Rule 57." Ruling at 18. This finding was wrong – in fact Reeves terminated the arbitration by withdrawing – and that error undermines the entire basis for the District Court's decision. No authority suggests that a party can lift a stay in favor of arbitration after withdrawing from that arbitration. To the contrary, apart from the District Court, those courts that have considered this question have held that a party may only lift a stay in favor of arbitration after it has exhausted all available options for proceeding and *the arbitrator* has terminated the proceeding. Neither happened here.

## A. No Authority Suggests An Arbitration "Has Been Had" When A Party Voluntarily Withdraws From That Arbitration.

In *every* case the District Court cited to support its decision to lift the stay because arbitration "had been had," the arbitral tribunal had already expressly terminated the underlying arbitration for non-payment. See Pre-Paid Legal Servs., 786 F.3d at 1298 ("Rather than alter the payment schedule, order Pre-Paid to pay Mr. Cahill's share, or relieve Mr. Cahill of his obligation to pay, the arbitrators first suspended

23

and then terminated the proceedings and closed the case."); <u>Freeman v. SmartPay Leasing, LLC</u>, 771 F. App'x 926, 933 (11th Cir. 2019) ("Freeman initiated an arbitration that was terminated by JAMS after SmartPay failed to pay the filing fee."); <u>CellInfo, LLC v. Am. Tower Corp.</u>, 506 F. Supp. 3d 61, 69-70 (D. Mass. 2020) (The arbitration panel "suspended the proceedings pursuant to AAA Rule-57" and "eventually terminated the proceedings[.]"); <u>Cota v. Art Brand Studios, LLC</u>, No. 21-CV-1519 (LJL), 2021 WL 4864588, at **6-7 (S.D.N.Y. Oct. 15, 2021) (arbitration panel suspended and then terminated arbitration pursuant to AAA Rule 57).  That did not happen in this case.

The District Court, citing the January 6 Letter, found that "the Arbitrator terminated the case as permitted by Rule 57."  Ruling at 18. But nothing in the record supports that conclusion. In fact, the record contradicts it.  The January 6 Letter never mentions Rule 57, and it was not issued by the arbitrator.[11]  App. 444-45.  Moreover, although AAA Commercial Rule 57 allows an arbitrator to terminate an arbitration for

---

[11] The arbitrator's name was Martin Gould.  <u>See</u> App. 439.  The January 6 Letter was written by Sharon Durkin, the AAA's case manager.  <u>See</u> App. 445.

24

non-payment of fees, that termination can only occur after (1) the arbitrator issues an order suspending the arbitration, and (2) the parties fail to make the full deposits requested within the period provided in the suspension order.  <u>See</u> SPA 33.[12]  Neither event occurred here.  <u>See</u> App. 444-45.  Not only was there no suspension of the arbitration, but Reeves did not give the arbitrator an opportunity to take *any* action – the December 10, 2020 email from Reeves' counsel sought no relief and simply announced that Reeves "will not be continuing with the arbitration." App. 503-04.  Finally, and most importantly, nothing in the text of the January 6 Letter indicates that the AAA took any action to terminate the arbitration or to default either party for non-payment.  To

---

[12] The pertinent portions of AAA Commercial Rule 57 (sections (e) and (f)) state:

> (e) Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration.  If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

> (f) If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

App. 259.

the contrary, the January 6 Letter states that the arbitration "is being closed <u>as withdrawn</u> as of the date of this letter." App. 444 (emphasis added).

In effect, the District Court took what the AAA considered a withdrawal *by Reeves*—which is exactly how Reeves himself characterized it—and recharacterized it as a Rule 57 termination *by the arbitrator*. That was improper. It is settled law that "procedural questions which grow out of the dispute <u>and bear on its final disposition</u> are presumptively not for the judge, but for an arbitrator, to decide." <u>Howsam v. Dean Witter Reynolds, Inc.</u>, 537 U.S. 79, 84 (2002) (internal quotes omitted, emphasis added). How and when an arbitration ends are questions governed by the rules of the arbitral body, and "arbitrators, as compared to judges, are 'comparatively more expert about the meaning of their own rule[s], [and] are comparatively better able to interpret and to apply [them].'" <u>Pre-Paid Legal Servs., Inc. v. Cahill</u>, 786 F.3d 1287, 1295 (10th Cir. 2015). In this case, when the District Court disregarded the AAA's determination that Reeves withdrew, and instead characterized that withdrawal as a termination by the arbitrator under

26

AAA Commercial Rule 57 (a rule the AAA itself never invoked), the District Court usurped the tribunal's authority.

If the District Court's recharacterization of Reeves' withdrawal as a termination by the arbitrator was error (and it was), then the Ruling's holding that the arbitration had been "had" under Section 3 is unsupportable. The District Court did not cite, and CNA is not aware of, a single case (aside from this one) where a court lifted a stay of arbitration at the request of a party who withdrew from arbitration. And for good reason. Section 3's text permits a judge to lift a stay of arbitration only when the arbitration "has been had in accordance with the terms of the agreement," 9 U.S.C.A. § 3, and arbitration agreements do not typically allow parties to withdraw from arbitration when they please. The agreement in this case is no exception – neither the Arbitration Agreement's text nor the AAA Rules it incorporates permit parties in arbitration to unilaterally withdraw. App. 60, 229-74.

Section 3's requirement that an arbitration properly terminate before a stay can be lifted has a purpose, and this Court should not ignore it. When a party "withdr[aws] from arbitration before the [tribunal] invoke[s] its own suspension or termination procedures," it strips the

27

tribunal of its ability "to decide in the first instance whether the non-payment of fees justifies the termination of arbitral proceedings." Brunner v. Lyft, Inc., No. 19-CV-04808-VC, 2019 WL 6001945, at **1-2 (N.D. Cal. Nov. 14, 2019). In this case, for example, Reeves' withdrawal foreclosed the arbitrator and the AAA from pursuing alternative arrangements that would have allowed Reeves to arbitrate without paying a deposit. For example, as the Deposit Letter explained, the arbitrator could have elected to "proceed with the hearing without full deposits," or he could have resigned, "in which case the AAA [would have] fill[ed] the vacancy with an arbitrator who [would] agree to serve without full deposits …." App. 441. Alternatively, the arbitrator could have required (or at least suggested) that CNA advance Reeves' deposit with the expectation of recovery if CNA prevailed. Other arbitrators have done this in equivalent circumstances. See Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1011 (9th Cir. 2004) ("The arbitrators gave Lifescan the option of advancing the fees owed by Premier so the final arbitration hearings could proceed, with an expectation that Lifescan would recoup the advance as part of any award."); Cota v. Art Brand Studios, LLC, No. 21-CV-1519 (LJL), 2021

28

WL 4864588, at *6 (S.D.N.Y. Oct. 15, 2021) (arbitral panel ordered that "Claimant may make payment on behalf of Respondents to avoid continued interruption of this proceeding. If Claimant does so, it may then make repayment of the amount paid a part of its claim."). But Reeves took these options off the table when he chose to "le[ave] the arbitral forum to press his claims in court." Brunner, 2019 WL 6001945, at *1. See also CellInfo, 506 F. Supp. 3d at 72 ("since CellInfo never asked the AAA for payment modifications after disclosing the root of the financial hardship, who knows what the AAA would have replied?"). An arbitration has not "been had in accordance with the terms of the agreement" in these circumstances. 9 U.S.C.A. § 3.

## B. The District Court Attempted To Take A "Narrow Path" To Lifting A Stay But Actually Built A Highway.

The District Court noted that, when interpreting Section 3, courts "in several circuits have 'mapped out a path, albeit narrow,' to lifting a stay and permitting parties to return to court from arbitration." Ruling at 14, quoting CellInfo, 506 F. Supp. 3d at 65. The District Court, however, did not follow that narrow path. Instead, the District Court formulated its own standard, and in so doing created a highway that parties forced into arbitration can use to return to court at will.

29

The Ruling states that, in four cases – Cota, Tillman v. Tillman, 825 F.3d 1069 (9th Cir. 2016), Freeman, and CellInfo:

> …courts have held that arbitration may be "had in accordance with the agreement" where two conditions have been met: (a) the arbitration—in conformity with procedures laid out in the relevant agreement and arbitral rules—began, transpired in part, and concluded when one party's[sic] failed to pay; and (b) the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration.

Ruling at 15.

Notably missing from this standard is any role for the arbitrator. Under the District Court's view, the only entities with a role in applying this standard are the party who wants to return to court, who can satisfy the standard's first prong simply by "fail[ing] to pay," id., and the court, which determines in the first instance whether "the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration," id.[13] Accordingly, the District Court's standard disregards the rule that "procedural questions … bearing on [an arbitration's] final disposition are presumptively not for the judge, but for an arbitrator, to decide." Howsam, 537 U.S. at 84.

---

[13] Although the Ruling does not state explicitly that courts evaluate parties' inability to pay, that is a necessary inference, as that is what the District Court did here.

30

The District Court's standard also ignores the facts of the cases on which it purports to rest. None of those cases either articulate or apply the standard that the District Court formulated. For good reason—that standard is unworkable.

### *Freeman* – An Arbitration "Has Been Had" When It Terminates Because The Party Seeking To Arbitrate Defaults On Its Payment Obligations.

The Eleventh Circuit addressed the question of whether arbitration "has been had" in <u>Freeman</u>. After initially proceeding in court, the parties in that case agreed to arbitrate before JAMS, and the district court stayed the case. 771 Fed. Appx. at 928. At the onset of the arbitration, JAMS informed the defendant ("SmartPay") that JAMS' consumer arbitration rules required SmartPay to cover all arbitration costs exceeding $250. <u>Id.</u> at 928-29. SmartPay refused to pay and, after making repeated attempts to get SmartPay to comply with its rules, JAMS closed the arbitration for nonpayment. <u>Id.</u> at 930. Freeman successfully moved the district court to lift the stay over SmartPay's objection, and the Eleventh Circuit affirmed on the grounds that the arbitration "had been had" because it "was terminated by JAMS after SmartPay failed to pay the filing fee." <u>Id.</u> at 935.

31

In short, <u>Freeman</u> stands for the straightforward proposition that a party waives its right to arbitrate when it defaults on its obligation to pay arbitration costs. <u>See</u> <u>id.</u> at 934 ("When SmartPay refused to comply with JAMS's Consumer Minimum Standards, SmartPay acted inconsistently with and, therefore, waived its contractual right to arbitration."). Nothing in <u>Freeman</u> suggests that a party who disagrees with its payment obligations can simply refuse to pay, withdraw, and return to court to have its disagreement adjudicated—particularly where, as here, the arbitrator concluded that he failed to establish an inability to pay. To the contrary, in <u>Freeman</u>, the Eleventh Circuit explicitly stated that "any dispute that SmartPay had with the fee-sharing arrangement could and should have been submitted to the arbitrator." <u>Id</u>. at 934.

### *Cota* – Arbitration "Has Been Had" When The Arbitrator Offers A Party A Choice Between Payment And Termination, And The Party Chooses Termination.

In <u>Cota</u>, the defendant in the litigation ("Art Brand") initiated an arbitration against plaintiffs (the "Artists"). 2021 WL 4864588, at **4-5. After the Artists filed twenty-two counterclaims in the arbitration, Art Brand insisted on a three-arbitrator panel, which, given the number of

32

claims at issue, resulted in the AAA billing the Artists $220,500 for their share of the arbitrator's compensation. Id. at *5.

The Artists' arbitration agreement contained "no provision regarding the payment of fees," so the Artists did not pay. Id. Instead, they sent the arbitration panel "a letter requesting permission to prosecute their counterclaims despite their inability to pay the fees of the arbitration in advance." Id.

After considering this and other correspondence from the parties, the panel suspended the arbitration and ordered that, if full payment of all outstanding deposits were not made by a specified deadline, the panel would terminate the arbitration. Id. at *6. The order also stated that "Claimant [Art Brand] may make payment on behalf of Respondents [Artists] to avoid continued interruption of this proceeding. If Claimant does so, it may then make repayment of the amount paid a part of its claim." Id. Art Brand subsequently notified the panel that it would not advance the Artists' share of the arbitration costs, and, after the payment deadline passed, the panel terminated the arbitration. Id. at **6-7.

The Artists then sued Art Brand in federal court and Art Brand moved to compel arbitration.  Id. at *7.  The court (Judge Liman) refused. He stated:

> Courts have held that an "arbitration has been had" within the meaning of Section 3 of the FAA <u>when an arbitral panel has terminated the proceeding for failure to pay</u> without conducting further proceedings or granting an award.

Id. at *11 (emphasis added).  Judge Liman then held:

> The arbitration here has been had in accordance with the terms of the parties' Agreements.  Those Agreements … did not specify who was to pay the fees.  Rule R-57 of the AAA then in effect provided that if the fees have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.  <u>The Panel … informed Art Brand that Art Brand could make payment on behalf of the Artists to avoid interruption in the proceeding. Art Brand did not make the required payment, and the arbitration was terminated.</u>  Accordingly, at this stage, the arbitration has been had.

Id. at 12 (emphasis added, internal citations and quotations omitted).  As this passage makes clear, the dispositive points for Judge Liman were (a) the arbitration agreement did not specify who would pay the arbitration's costs, (b) the applicable arbitration rules allowed the AAA to order a party to advance the costs, (c) the arbitrator told Art Brand it could advance the costs if it wanted the arbitration to continue, (d) Art Brand refused, and then (e) the panel terminated the arbitration.  As with

34

<u>Freeman</u>, nothing in <u>Cota</u> suggests that, instead of requesting relief from the panel, the Artists could simply have refused to pay, withdrawn from the arbitration, and then petitioned Judge Liman to proceed in court.

### *Tillman* – Arbitration "Has Been Had" After A Party Exhausts Its Avenues For Proceeding And The Arbitrator Terminates The Arbitration.

The plaintiff in <u>Tillman</u> ("Tillman") sued her former law firm (the "Firm") for malpractice and the Firm compelled arbitration.  <u>Id.</u> at 1071. Tillman borrowed money to fund the arbitration and her legal counsel agreed to front certain costs.  "Nevertheless, Tillman was ultimately unable to provide the required deposit of $18,562.50 the AAA asked for as a condition of continuing the proceedings."  <u>Id</u>. at 1072.  After this occurred, the AAA:

> …inquired as to whether the firm was willing to cover the deposit, but the firm declined. Tillman then requested that the AAA require the firm to pay the deposits going forward, under AAA rules authorizing interim relief. The arbitrator responded that it did not intend to decide the motion for interim relief until the deposits had been paid; set a deadline for Tillman to submit the funds; and ultimately terminated the arbitration due to the missing deposits.

<u>Id</u>. (internal quotations and brackets omitted).

The Firm successfully sought to lift the stay and dismiss the complaint in district court.  <u>Id.</u> at 1072-73.  The Ninth Circuit reversed,

35

holding that the case should be allowed to proceed.  As the Ninth Circuit

explained:

> The retainer agreement between Tillman and the Rheingold
> firm explicitly incorporated the AAA's rules. … Current Rule
> R-53 allows the AAA to prescribe fees and gives it the sole
> discretion to reduce fees in the event of hardship.  Rule R-56
> allows the AAA to require the parties to pay deposits in
> advance in "such sums of money as it deems necessary."  Rule
> R-57 states that in the event of nonpayment, the arbitrator
> may "limit[ ] a party's ability to assert or pursue their claim,"
> and "may order the suspension of the arbitration."  If such
> suspension has occurred and the parties still fail to make full
> deposits within a designated time period, the arbitrator "may
> terminate the proceedings." <u>All these steps were followed
> here, including terminating the proceedings without issuance
> of an award</u>.  Because the arbitration had "been had"
> pursuant to the agreement between the firm and Tillman, the
> district properly lifted the stay.

<u>Tillman</u>, 825 F.3d at 1074 (internal citations omitted, emphasis added).

The rule that emerges from <u>Tillman</u> is that, when a party exhausts

all its options for proceeding in arbitration, and the arbitrator terminates

the arbitration anyway, then the arbitration "has been had" under

Section 3.  After all, <u>Tillman</u>, unlike Reeves, did everything she could to

keep her arbitration alive: she sought alternate funds for the arbitration,

her counsel agreed to front certain costs, and she asked the arbitrator to

reapportion her arbitration costs, which the arbitrator declined to do

before terminating her arbitration.  <u>Id.</u> at 1072-73.  Reeves, in contrast,

36

chose to withdraw rather than seek additional relief from the arbitrator or the AAA. As the Ninth Circuit explained in <u>Tillman</u>, this is precisely what an arbitration party may *not* do. <u>See id.</u> at 1075 ("Our decision that Tillman's case may proceed does not mean that parties may refuse to arbitrate by <u>choosing</u> not to pay for arbitration.") (Emphasis in original).

### *CellInfo* - Good Faith Requires More Than "Empty Pockets."

Unlike the other three cases the District Court cited, <u>CellInfo</u> was a decision where the court refused to lift a stay of arbitration because, it found, the party seeking relief "had not demonstrated a sufficiently sincere good faith effort to comply with the flexible AAA requirements." 506 F. Supp. 3d at 72. In that case, the plaintiff ("CellInfo") sued the defendants (collectively, "American Tower") in district court, but the case was stayed in favor of arbitration. <u>Id.</u> at 68. The arbitration (before a three-person panel) was protracted, CellInfo incurred legal fees exceeding $1,250,000, and CellInfo's lawyer withdrew. <u>Id</u>. When the time came for CellInfo to pay its final deposit to the AAA, CellInfo claimed it lacked the funds to proceed. <u>Id.</u> at 68-69. The panel suspended the arbitration pursuant to AAA Rule 57 and "suggested that American Tower pay CellInfo's outstanding AAA invoices to keep the arbitration

37

going." Id. at 69-70.  When American Tower declined, the panel terminated the arbitration.  Id. at 70.

CellInfo, like Reeves, asked the district court to lift the stay, but the court (Judge Young) refused.  Although Judge Young was skeptical of CellInfo's inability to pay (it had in the past raised money from investors to pay its bills), he explained that the crux of the problem was that "CellInfo failed to do the one simple thing common sense calls for in such a situation, that is, to reach out to the AAA to address its financial hardship." Id. at *71.  As Judge Young noted, the AAA's Rules allow arbitrators to "reduce fees in the event of hardship" and "adjust the payment of costs in light of circumstances."  Id., quoting Tillman, 825 F.3d at 1074 and Lifescan, Inc. v. Premier Diabetic Servs., Inc., 363 F.3d 1010, 1013 (9th Cir. 2004).  Moreover, "[r]elying only on its drained bank account, CellInfo held back from the Panel helpful information" about the impact of its lawyer's withdrawal on CellInfo's ability to maintain its litigation financing.  Id. at *72.  This conduct, Judge Young found, amounted to a "failure or neglect to comply with the arbitration."  Id.

The standard for lifting a stay that Judge Young articulated in CellInfo was very different from the one the District Court articulated in

38

its Ruling. Although the District Court held that a party seeking to lift a stay need only show that it "failed to pay … because of a good-faith genuine inability to afford the costs of arbitration," Ruling at 15, <u>CellInfo</u> holds this is not enough. According to Judge Young, to lift a stay in favor of arbitration:

> … <u>a party should do more than simply show empty pockets</u>. Rather, it must show that it diligently arbitrated, that it sought alternative funds but failed, that it attempted to adjust payment, get a discount or delay from the AAA, that it did not drag foot without action, that it made reasonable efforts *to arbitrate* in good faith.

<u>Id.</u> at 67 (emphasis added). CellInfo (like Reeves) did none of these things, and it was not entitled to relief because "the good faith standard required it to do more." <u>Id.</u> at 72.

## C. The Minimum Requirements For Lifting A Stay, And Why Reeves Does Not Meet Them.

The cases that the District Court relied on its Ruling in fact establish that the District Court reached the wrong conclusion. An arbitration cannot "have been had" under Section 3 simply because (a) the arbitration "concluded when one party's [sic] failed to pay," and (b) "the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration." Ruling at 15. If that were

39

truly all that was necessary, any party forced into arbitration could claim an inability to pay, unilaterally withdraw, return to court, and then present the evidence of its professed inability to pay for adjudication by the court. Not only would this process eviscerate the arbitrator's ability "to decide in the first instance whether the non-payment of fees justifies the termination of arbitral proceedings," Brunner, 2019 WL 6001945, at *2, it would remove the arbitral authorities' discretion to reduce or reapportion payment obligations. See CellInfo, 506 F. Supp. 3d at 72. None of the authorities the District Court cites suggest this is the proper way to proceed. See, e.g., Freeman, 771 F. App'x at 934 ("any dispute that SmartPay had with the fee-sharing arrangement could and should have been submitted to the arbitrator").

Whatever rule a court applies to determine whether and when an arbitral stay can be lifted must, at a minimum, require that the moving party (a) exhaust all avenues for relief available from the arbitral authority, (b) present all its hardship evidence for that authority's consideration, and (c) allow that authority to determine whether, in light of that evidence, the arbitration's costs should be reassessed, or (if no reassessment is warranted) whether the arbitration should be

40

terminated for nonpayment. Compare Tillman, 825 F.3d at 1075 n.1 (Tillman "made genuine efforts to make alternate payment arrangements") with CellInfo, 506 F. Supp. 3d at 71 (CellInfo "failed to reach out to the AAA to address its financial hardship" and "elect[ed] to withhold … crucial information from the AAA").

Reeves did none of these things. He did not even try to pursue the options for proceeding without deposits that the AAA offered in the Deposit Letter. See App. 441. Instead, he "withdrew from arbitration before the AAA invoked its own suspension or termination procedures," and thereby denied the arbitrator the ability "to decide in the first instance" how to deal with Reeves' professed inability to pay his deposit. Brunner, 2019 WL 6001945, at **1-2. Moreover, Reeves withheld evidence from the arbitrator about his financial situation that he later presented to the District Court, see supra at 9-11, 15, even though the arbitrator had made clear he would consider any additional evidence Reeves might have. See App. 439 ("the arbitrator has the authority to allocate expenses as he sees fit after hearing all of the evidence, so that the cost sharing provision may or may not reflect the final allocation of arbitral fees[.]"). This is not good faith. It is gamesmanship designed to

41

"manipulat[e] the justice system by forum shopping and noncompliance." CellInfo, 506 F. Supp. 3d at 67. See also id. at 72 (refusing to lift stay because, in part, "CellInfo held back from the Panel helpful information"). As far as CNA is aware, no court, other than the District Court, has ever lifted an arbitration stay in these circumstances, and the District Court's decision to do so in this case was error.

## II. CNA DID NOT WAIVE ITS RIGHT TO ARBITRATE.

The District Court held that CNA's "refusal to advance Reeves' portion of the arbitrator's compensation constituted conduct inconsistent with the right to arbitrate." Ruling at 25 (internal quotes omitted). This holding rests on at least one legal and two factual errors.

### A. The District Court's Legal Error: Failing To Pay An Opponent's Arbitration Costs Is Not Inconsistent With The Right To Arbitrate.

The District Court rested its holding on Cota. According to the District Court, the waiver rule that emerged from Cota was, "[i]n effect, if a party seeks to compel arbitration, then refuses an opportunity to advance costs to ensure that the arbitration takes place, it acts inconsistently with its contractual arbitration right." Ruling at 26. This was not Cota's holding, and if it was, that holding was wrong.

42

As discussed above, see supra at 32-34, the litigation defendant in Cota (Art Brand) had initiated an arbitration against the litigation plaintiffs (the "Artists"). Cota, 2021 WL 4864588, at **4-5. The Artists eventually received a bill from the AAA for their share of the arbitrator's compensation, which the Artists claimed they could not pay. Id. at *5. As the parties' arbitration agreement did not specify how arbitration costs were to be divided, the Artists petitioned the arbitration panel for "permission to prosecute their counterclaims despite their inability to pay the fees of the arbitration in advance." Id. After considering this request, the panel suspended the arbitration and offered Art Brand the opportunity to advance the Artists' share of the compensation and "make repayment of the amount paid a part of its claim." Id. at *6. After Art Brand refused, the panel terminated the arbitration. Id. at **6-7.

The Artists then sued Art Brand in federal court and Art Brand moved to compel arbitration. Id. at *7. Judge Liman refused, holding (in part) that Art Brand had "acted inconsistently with its arbitration right." Id. at *10. Judge Liman noted that:

> Art Brand's initial actions were consistent with an intent to prosecute its arbitration claim. It filed the demand for arbitration, initially paid the fees that were due from it, and, even after the Artists expressed their inability to pay, still

43

stated that it was willing to pay its share of the arbitral fees and asked the arbitral panel to proceed to adjudicate its claims and to dismiss the Artists' counterclaims.

Id.  However, once the panel issued its order, the context surrounding Art Brand's refusal to pay changed.  This was because:

> …the Panel rejected Art Brand's request [to dismiss the counterclaims] and declined to continue the arbitration in that manner.  Instead, it issued an order that it would terminate the entire arbitration—both the claims and the counterclaims—if full payment was not made.  The order also gave Art Brand the right to pay the fees for both parties (subject to recoupment from the Artists if Art Brand prevailed) if Art Brand wanted to continue the arbitration, including both its claims and the counterclaims.

Id.  As Judge Liman explained, it was Art Brand's response to the panel's order that constituted conduct inconsistent with its arbitration right:

> Thereafter, Art Brand had a choice—it could pay both fees if it wanted to prosecute the claims and take the risk that it might never be able to recover the share of fees owed by the Artists or it could elect not to pay either set of fees and allow the arbitration (including its claims) to terminate.  It elected the latter, knowing that doing so would eliminate its ability to arbitrate.  Having chosen not to pay the arbitral fees and having taken action that it knew would result in the termination of the arbitration, Defendant acted inconsistently with its arbitration right.

Id. at *10 (emphasis added).  Accordingly, the rule that emerges from Cota is that when (1) a party initiates an arbitration, (2) the arbitrator gives that party the choice between paying his opponent's arbitration fees

44

or terminating the arbitration, and (3) that party chooses termination, that party acts "inconsistently with its arbitration right." Id.

There are obvious differences between Cota's fact pattern and the fact pattern here.  For example, in this case it was Reeves, not CNA, that was pursuing affirmative claims in arbitration, CNA did not inflate the arbitration costs by insisting on a three-arbitrator panel, and it was Reeves, not the arbitrator, who chose to end the arbitration.  There are also significant issues that would arise if a court were to apply Cota's logic to a case, like this one, given that the parties' arbitration agreement—which must be enforced according to its terms—dictates that arbitration costs be split.  See App. 60; AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740, 1742 (2011) ("courts must place arbitration agreements on an equal footing with other contracts … and enforce them according to their terms").

But the dispositive difference between Cota and this case is that, in Cota, the panel told Art Brand that the arbitration would end if it failed to advance the Artists' share of the panel's compensation.  Nothing like that occurred here.  Had Reeves asked for that relief, the arbitrator might have granted it, and faced with that choice, CNA might have paid.  In the

45

alternative, the arbitrator might have agreed to "proceed with the hearing without full deposits," or he might have resigned, "in which case the AAA [would have] fill[ed] the vacancy with an arbitrator who [would] agree to serve without full deposits …." Deposit Letter at 1, App. 441. But no one knows if any of these possibilities would have occurred because Reeves foreclosed all of them by withdrawing his arbitration demand just two days after the arbitrator rejected his motion to apply the AAA's Employment Rules. App. 503.

Of course, the District Court read <u>Cota</u> differently. In the District Court's mind, the <u>Cota</u> arbitration panel's order requiring Art Brand to choose between advancing the Artist's arbitration fees and terminating the arbitration had no significance, because a party "acts inconsistently with its contractual arbitration right" whenever it "seeks to compel arbitration" and "then refuses an opportunity to advance costs to ensure that the arbitration takes place…." Ruling at 26.

Even if CNA had been offered that opportunity here (and it was not), this cannot be correct. Under the waiver rule articulated by the District Court, all a party compelled to arbitration need do to avoid a contractual cost-splitting obligation is claim it cannot pay. Once that

46

claim is made, the party who compelled arbitration must either pay its opponent's fees or waive its arbitration rights by refusing to do so. Under the District Court's logic, that tactic will work even if the parties' arbitration agreement requires cost splitting, and *even if, as in this case, the arbitrator rejects the non-paying party's claim that it cannot pay*. See App. 439. In effect, the District's Court's logic not only invites a return to Court every time a party claims an inability to pay, it transforms every refusal to pay arbitration costs into an ultimatum forcing the other party to pay for its opponent or return to court. This "mean[s] that parties may refuse to arbitrate by <u>choosing</u> not to pay for arbitration," a result that is not only unworkable, but "contrary to 'the structure and purpose of the FAA'...." <u>Tillman</u>, 825 F.3d at 1075 n.1 (emphasis added), quoting <u>Sink v. Aden Enters.</u>, 352 F.3d 1197, 1200 (9th Cir. 2003).

Reeves will likely try to defend the District Court's reasoning by arguing that courts can check abuse of this tactic by evaluating a party's claimed inability to pay arbitration costs once litigation resumes. But this ignores the terms of the parties' Arbitration Agreement – which states that disputes "concerning … waiver of … this Arbitration Agreement … shall be submitted to binding arbitration before the [AAA]"

47

App. 59 – and turns the established division of labor between an arbitrator and a court on its head. As previously discussed, in an arbitration "procedural questions which … bear on … final disposition are presumptively not for the judge, but for an arbitrator, to decide." Howsam, 537 U.S. at 84 (internal quotes omitted). "So, too, the presumption is that the arbitrator should decide allegation[s] of waiver…." Id. In line with this guidance, courts leave quintessentially procedural issues like disputes over fee payments, including whether a party's failure to pay amounts to waiver, to arbitrators. See, e.g., Dealer Computer Servs., Inc. v. Old Colony Motors, Inc., 588 F.3d 884, 887 (5th Cir. 2009) ("Payment of fees is a procedural condition precedent that the trial court should not review.") (citing Howsam); Sophinos v. Quadriga Worldwide Ltd., No. CV-16-01273-MWF-MRWX, 2016 WL 10966561, at *2 (C.D. Cal. Aug. 4, 2016) ("whether Defendant's nonpayment amounted to default or waiver should be decided by the arbitrator, and not this Court"); Union Cent. Life Ins. Co. v. Andraos, No. 1:09-CV-758, 2011 WL 6091771, at *5 (S.D. Ohio Oct. 21, 2011), report and recommendation adopted, No. C-1-09-758, 2011 WL 6100275 (S.D. Ohio Dec. 7, 2011) ("plaintiff's argument that the parties' non-payment of arbitration fees

48

equates to a waiver of arbitration is a procedural issue which should be determined by the arbitrator").

The District Court's holding throws this precedent (and the terms of the Arbitration Agreement) out the window. Even if one assumes that a party who refuses to pay its opponent's arbitration costs could avoid waiver by rebutting its opponent's claimed inability to pay in court – and nothing in the District Court's Ruling suggests this is possible, <u>see</u> Ruling at 26 (holding that merely "refus[ing] an opportunity to advance costs" is inconsistent with arbitration rights) – the District Court's rule vests courts with sole authority to determine when refusing to pay an opponent's fees amounts to waiver. And it does this even though arbitrators are "comparatively more expert about the meaning of their own rule[s], [and] are comparatively better able to interpret and to apply [them]." <u>Howsam</u>, 537 U.S. at 86. Nothing in the Supreme Court's FAA jurisprudence envisions such a result.

Under the law as it exists now, for CNA to waive its arbitration rights, it must engage in "conduct … which reflects a positive and unequivocal election to ignore [its] arbitration rights." <u>Zhang v. Wang</u>, 317 F. App'x 26, 28 (2d Cir. 2008). "[W]aiver of the right to arbitration is

EAST/193978178

not to be lightly inferred," <u>Thyssen, Inc. v. Calypso Shipping Corp.</u>, 310 F.3d 102, 105 (2d Cir. 2002), the "heavy burden" of proving it is on Reeves, <u>Sweater Bee by Banff, Ltd. v. Manhattan Indus., Inc.</u>, 754 F.2d 457, 466 (2d Cir. 1985), and "any doubts concerning whether there has been a waiver are resolved in favor of arbitration," <u>Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.</u>, 67 F.3d 20, 25 (2d Cir. 1995)). The fact pattern of this case does not approach these standards. CNA did not elect to terminate the arbitration. *Reeves* ended the arbitration when he withdrew his arbitration demand. That was *Reeves'* choice, not CNA's, and a party does not waive its right to arbitration when its *opponent* chooses not to arbitrate. <u>See</u> <u>Brunner</u>, 2019 WL 6001945, at *1 ("the only party in this case who defaulted under section 4 is Brunner, who left the arbitral forum to press these claims in court").

## B. The District Court's First Factual Error: CNA Did Not Refuse To Advance Reeves' Share Of The Arbitrator's Compensation.

Even if the District Court got the law right (and it did not), its finding that CNA "refus[ed] to advance Reeves' portion of the arbitrator's compensation," Ruling at 25, was also wrong. CNA could not have

50

refused to advance Reeves' portion of the arbitrator's compensation because neither Reeves nor the arbitrator ever asked CNA to do so.

Reeves was not looking to have CNA advance his portion of the fees. "Advancing" an expense connotes an expectation of repayment. See, e.g., Cota, 2021 WL 4864588, at *5 ("the tribunal had directed Art Brand to advance the full costs of the arbitration with the understanding that, if Art Brand prevailed, the final award would include reimbursement to Art Brand for the Artists' portion of the arbitration fees"). Instead, Reeves asked the arbitrator to declare the AAA's Commercial Rules cost-splitting provisions unconscionable and apply the AAA's Employment Rules in their place. App. 438-39. Reeves *never* suggested to either CNA or the arbitrator that he would *ever* pay his share of the arbitrator's compensation, at any time or under any circumstance.[14] Cf.

---

[14] The District Court suggested that if CNA had advanced Reeves' share of the arbitrator's compensation CNA would have been entitled to reimbursement under the Arbitration Agreement's fee-shifting clause. See Ruling at 26. But CNA had waived its right to recover under that clause, and thus would have no recourse for recovery. See App. 311-13. Moreover, by its terms, the provision the District Court cited would not apply. In its entirety, the provision states:

> Attorneys' Fees: <u>Should either Party incur attorneys' fees in order to enforce the terms of this Agreement, including this Arbitration Agreement</u>, whether or not an arbitration is

51

Cota, 2021 WL 4864588, at *5 (Artists sent Art Brand a letter stating that "any overage of arbitration fees paid by Art Brand can be remedied through the final award"). Nor did the arbitrator suggest that CNA should pay Reeves' share or that CNA could recover what it paid if it prevailed. Cf. id. at *6 (Arbitration panel held "[Art Brand] may make payment on behalf of [Artists] to avoid continued interruption of this proceeding. If [Art Brand] does so, it may then make repayment of the amount paid a part of its claim."). Indeed, the Arbitrator had no reason to make those suggestions, as he rejected Reeves' claimed inability to pay. App. 439.

---

instituted, the prevailing Party shall be entitled to reimbursement by the other Party of all litigation and arbitration costs, including arbitration fees.

App. 61 (emphasis added). This language does not apply to Reeves' demand because that demand did not seek to enforce Reeves' agreement. It sought statutory damages for misclassification. See Ruling at 1; App. 438. In any case, even if CNA had not waived the fee-shifting provision and even if the provision did apply, given Reeves' disregard of his agreement's cost-splitting clause, nothing suggests Reeves would have honored it.

## C. The District Court's Second Factual Error: CNA Did Not Act Inconsistently With Its Representation To The Court.

At oral argument, CNA's counsel represented to the District Court that "[i]f the Triple A determines based upon an adequate showing from the plaintiffs that they cannot afford the cost of arbitration, we will front them." App. 322.  CNA did not break that promise.  It did not volunteer to pay Reeves' share of the arbitrator's compensation because the arbitrator concluded that Reeves had *not* shown he was unable to pay his share.  See App. 439 ("Mr. Reeves claims, without supporting evidence, that bearing one-half of the costs of the arbitrator's fees would make it prohibitively expensive … and I cannot envision this matter costing anything approaching 'tens of thousands of dollars.'").

In finding that CNA acted contrary to this representation, the District Court conflated the AAA administrator's acceptance of Reeves' hardship waiver with the arbitrator's rejection of Reeves' request to avoid paying his share of the arbitrator's compensation.  See Ruling at 27.  But the AAA was clear that its waiver decision (which was based on a form filled out by Reeves, App. 500-01) had no bearing on the arbitrator's compensation decision.  App. 413.  Under the AAA's rules, it was the

53

*arbitrator's* responsibility to set the compensation deposit assessed to each party, see AAA Rule 56(b), and the arbitrator – with the benefit of briefing and evidence that the AAA administrator did not consider[15] – rejected Reeves' claim that he could not pay. CNA never represented that it would pay Reeves' share of the costs if Reeves *failed* to convince the AAA he could not pay, and the District Court's finding that CNA acted contrary to its representation was clear error.

## III. CONCLUSION

In the end, the record is clear that Reeves – who had to be compelled into arbitration in the first place – declined to pursue the alternatives to payment offered by the AAA and withdrew his arbitration demand by choice. In these circumstances the correct disposition is to "dismiss [Reeves'] complaint under Fed. R. Civ. P. 41(b), for failure to comply with

---

[15] Although copies of the evidence are not in the record, CNA also submitted evidence to the arbitrator in connection with the fee briefing. See App. 438 (citing in footnote affidavit evidence submitted by CNA). In addition, the record the arbitrator considered indicated that Reeves' financial position had improved between July (when Reeves submitted his waiver form to the AAA) and October (when Reeves filed his motion with the arbitrator). See supra at 8-11. Although there was no way to calculate the amount of that improvement, that was because Reeves failed to present the arbitrator with evidence of his current income and expenses.

the order to arbitrate despite [his] ability to do so." <u>Tillman</u>, 825 F.3d at 1076. CNA respectfully requests that this Court remand the case to the District Court for entry of such an order. If this Court is not inclined to dismiss Reeves' complaint, CNA requests that this Court direct the District Court to reinstate the stay, as Reeves' "causes of action may still be pursued in accordance with the parties' preexisting agreements" before the AAA. <u>CellInfo</u>, 506 F. Supp. 3d at 73.

Respectfully submitted,

*/s/ Matthew J. Iverson*
Matthew J. Iverson
DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, MA 02110-1447
(617) 406-6000
matthew.iverson@dlapiper.com

Norman M. Leon
DLA PIPER LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606
(312) 368-4000
norman.leon@dlapiper.com

Attorneys for Defendant/Appellee

DATED: July 12, 2022

55

## **CERTIFICATE OF SERVICE**

I, Matthew J. Iverson, hereby certify that on July 12, 2022, I caused the Appellant's Opening Brief and Appendix to be electronically filed with the Clerk of the Court of Appeals for the Second Circuit using the CM/ECF system and to be served on all counsel of record.

*/s/ Matthew J. Iverson*
Matthew J. Iverson

Dated: July 12, 2022

56

# CERTIFICATION OF COMPLIANCE

With Type-Volume Limitation, Typeface Requirements,
and Type-Style Requirements

The undersigned certifies as follows:

1.  This document complies with the word limit requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1 because it contains 12,564 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface of 14 points.

*/s/ Matthew J. Iverson*
Matthew J. Iverson

Dated: July 12, 2022

57

## <u>Table of Contents – Special Appendix</u>

March 16, 2022 District Court Ruling Lifting Stay.........................  SPA 1

American Arbitration Association Commercial Rule 56 ................SPA 32

American Arbitration Association Commercial Rule 57 ...............SPA 32

9 U.S.C. § 3 – Stay of Proceedings Where Issue Therein Referrable to Arbitration......................................................................SPA 34

9 U.S.C. § 16 – Appeals ..................................................................SPA 35

16 C.F.R. § 436.1 – Definitions ......................................................SPA 37

28 U.S.C.A § 1332 – Diversity of Citizenship; Amount in Controversy; Costs .........................................................................SPA 41

FRCP Rule 41 – Dismissal of Actions............................................SPA 48

April 13, 2022 American Arbitration Association Detailed Invoice/Statement for Quincy Reeves Matter..............................  SPA 53

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CARIBE BILLIE, ET AL. | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:19-CV-00092 (JCH) |
| v. | : | |
| | : | |
| COVERALL NORTH AMERICA | : | |
| Defendants. | : | MARCH 16, 2022 |

**RULING ON PLAINTIFFS' MOTION TO LIFT THE STAY (DOC. NO. 54)**

## I. INTRODUCTION

Plaintiffs Caribe Billie ("Billie") and Quincy Reeves ("Reeves") bring this action against the defendant, commercial cleaning services provider Coverall North America, Inc., ("Coverall"), alleging that Coverall misclassified them as independent contractors and withheld portions of their wages under section 31-71e of the Connecticut General Statutes.  By a Ruling dated March 12, 2020, this court stayed the plaintiffs' action and compelled arbitration. See Ruling (Doc. No. 51). Now before this court is the plaintiffs' Motion to Lift the Stay (Doc. No. 54).  For the reasons stated below, the plaintiffs' Motion is granted in part.

## II. BACKGROUND

The plaintiffs, janitorial workers who entered into "franchise agreements" with Coverall, filed this case as a putative class action in January 2019.  See Compl. (Doc. No.  1).  In their Complaint, the plaintiffs contended that Coverall wrongfully classified

them as independent contractors rather than employees and denied them wages owed under Connecticut law.[1]

Coverall moved to dismiss the plaintiffs' claims or to compel arbitration on the basis of arbitration agreements in the plaintiffs' Franchise Agreements and subsequent releases and amendments (collectively, "Agreements").  See Coverall Mot. to Dismiss or Compel (Doc. No. 25).[2]  In opposition, the plaintiffs objected on a number of grounds, including the enforceability of cost-splitting provisions in the Agreements.  See Billie v. Coverall N. Am., Inc., 444 F. Supp. 3d 332, 349 (D. Conn. 2020) (hereinafter "Billie I") (docketed as Ruling (Doc. No. 51)). The provisions, which the plaintiffs argued were unconscionable, required that the plaintiffs pay all arbitration filing fees while the parties split the remaining costs.  Id.  At oral argument, counsel for Coverall represented that his client would not seek to enforce some of the cost splitting measures, including an attorneys' fee provisions in Reeves' Agreement.  See id. at 351 n. 7.  In March 2020, this court granted Coverall's Motion to Compel Arbitration.  See id. at 355.  In its Ruling, the court held that the plaintiffs "failed to meet their burden of establishing substantive unconscionability as to the cost-sharing provision." Billie I, 444 F. Supp. 3d at 351.

After the court's Ruling, Billie and Reeves, as well as a third individual, Veronica Flores, separately filed claims against Coverall before the American Arbitration

---

[1] The court provided a more detailed overview of the Agreements between the plaintiffs and Coverall in its March 12, 2020 Ruling on the defendant's Motion to Compel Arbitration. See Ruling (Doc. No. 51); Billie v. Coverall N. Am., Inc., 444 F. Supp. 3d 332, 347 (D. Conn. 2020).

[2] In addition to his Franchise Agreement, Billie entered into a Transfer Agreement and signed an Amendment and a guarantee including arbitration clauses. See Billie Transfer Agreement (Doc. No. 27-2); CNC Amendment (Doc. No. 27-3); Billie Guarantee (Doc. No. 27-4).  Reeves similarly entered into a Transfer Agreement as well as a Guarantee and General Release of Claims. See (Doc. Nos. 27-6, 27-7, 27-8). Each agreement contained an arbitration clause.

Association ("AAA"). <u>See</u> Pls.' Mem. in Support of Mot. to Lift the Stay at 1 (Doc. No. 54-1) ("Pls.' Mem."). The three arbitrations proceeded as follows.

A.     <u>Billie</u>

Billie's Arbitrator found that the cost-splitting provision in his Agreement was unenforceable, ordering Coverall to pay the costs of arbitration. <u>See</u> Pls.' Mem. at 1 n. 1. Billie's arbitration is ongoing, but any decision issued in his arbitration will have no preclusive effect on those of Reeves or Flores. <u>See</u> Billie Agreement at ¶ 21(A)(11) (Doc. No. 27-1) ("A decision by the arbitrator . . . against either Coverall or Franchisee shall be confidential . . . and may not be used collaterally against either of them in existing or subsequent litigation or arbitration . . . .").

B.     <u>Flores</u>

Flores, who is not a named plaintiff in this case,[3] was ordered to make a $2,500 deposit before the Arbitrator would consider the enforceability of the cost-splitting provision in her Agreement. <u>See</u> Liss-Riordan Decl. at Exs. B, I. Because Flores was unable to pay the required deposit, the Arbitrator informed her that he would close her case within 30 days of January 21, 2021. <u>See</u> id at Ex. B. Her arbitration has since been closed. <u>See</u> Pls.' Mem. at 7.

C.     <u>Reeves</u>

At the outset of Reeves' arbitration, Reeves and Coverall sparred over which set of procedural rules would govern the dispute: the AAA Employment Arbitration Rules or the AAA Commercial Arbitration Rules. Under the Employment Arbitration Rules, the

---

[3] Although Billie and Reeves are the named plaintiffs in the case before this court, the plaintiffs' Motion to Lift the Stay and their accompanying Memorandum urge the court to "allow Reeves and <u>Flores</u> to proceed on their . . . claims in court . . . ." <u>See</u> Pls.' Mem. at 2 (emphasis added). As the court discusses following, <u>see</u> pp. 8-9, <u>infra</u>, Flores is not a plaintiff in this matter.

filing fee for individuals is capped at $300, and all expenses are borne by the employer. See Employment/Workplace Fee Schedule ("Employment Fee Schedule"), available at: https://www.adr.org/employment. By contrast, under the Commercial Arbitration Rules, the claimant bears the filing fee, which begins at a minimum of $925, while the parties split the remaining costs. See Commercial Arbitration Rules and Mediation Procedures Administrative Fee Schedules ("Commercial Fee Schedule"), available at: http://info.adr.org/feeschedule/.

Initially, the AAA indicated that it would apply the Employment Fee Schedule, holding the employer or company responsible for arbitrator compensation. See Liss-Riordan Decl. at Ex. A. Coverall objected to the use of the Employment Fee Schedule, and the AAA reversed itself and decided to apply the Commercial Fee Schedule and Rules. Id. Under Rule 53 of the Commercial Rules, Reeves was obligated to pay the filing fee, while Rule 54 mandated that the two parties split most remaining expenses equally. See American Arbitration Association Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules").[4]

Following the AAA's decision to apply the Commercial Rules, Reeves applied for and the AAA awarded a Financial Hardship Fee Waiver. See Liss-Riordan Decl. at Ex. A. However, while the waiver mitigated some of the costs of arbitration, it did "not affect

---

[4] The defendants submitted an excerpt of the AAA Commercial Rules. See Kurtz Decl. at Ex. D. The court takes judicial notice of the entirety of the Commercial Rules. See Klein v. ATP Flight School, LLP, No. 14-CV-1522, 2014 WL 3013294, at *10 n.6 (E.D.N.Y. July 3, 2014) (noting that a court may take judicial notice of the AAA Rules "on the theory that the AAA Rules are incorporated by reference in the arbitration agreement at issue, or that the AAA Rules are 'a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'") (quoting Fed. R. Evid. 201(b)(2)).

any obligation to pay arbitrator compensation", leaving Reeves responsible for half of the arbitrator's fees.  Id.

Once an Arbitrator had been assigned to his case, Reeves again challenged the application of the Commercial Rules, arguing that the Employment Fee Schedule should govern his dispute.  See id. at Ex. F.  Both parties briefed the issue of cost-sharing.  See id. at ¶ 4.  Reeves submitted a financial affidavit attesting that he was struggling financially due to the pandemic and would not be able to afford thousands of dollars in arbitrator expenses.  See Kurtz Decl. at Ex. A ¶¶ 5-6.  He attached his fee waiver application, on which he listed $1,861 of gross pay or wages, $1,130.74 of post-tax monthly take-home pay, unemployment insurance of $568 per week, and $15,578 in self-employment income through auto sales from the year prior.  Id. at Ex. A.  He also noted that his wife makes approximately $36,000 per year as a medical assistant, and he reported $12,446.67 in cash or checking accounts.  Id.  He noted that his adult son had been laid off from his part time job and was living at home.

The Arbitrator denied Reeves' Motion on December 8, 2020, determining that Reeves had not provided sufficient evidence to show that he was unable to pay, that the cost sharing provision was unconscionable, or that the Employment Rules rather than the Commercial Rules should apply to the arbitration.  See Liss-Riordan Decl. at Ex. F.  Thus, the Commercial Rules continued to govern Reeves' arbitration, requiring him to pay one-half of the Arbitrator's fees.  Id.

Soon thereafter, Reeves was billed $3,937.50 for his share of the arbitrator's fees.  See id. at Ex. G.  AAA contacted both Reeves and Coverall on December 4, 2020, to report that it had not received the $3,937.50 deposit from Reeves or a

$2,562.50 deposit from Coverall to cover the Arbitrator's compensation. <u>Id.</u>  Six days later, Reeves' counsel emailed Coverall's counsel and the AAA, stating that Reeves could "not afford the arbitrator fees for this arbitration so he [would] not be continuing the arbitration." <u>See</u> Kurtz Decl. at Ex. B.  The case was terminated without a decision on the merits on January 6, 2021.  <u>See</u> Liss-Riordan Decl. at Ex. H.

In connection with the present Motion to Lift the Stay, Reeves has submitted a new Affidavit to this court detailing household finances for himself, his wife, and his two children.  <u>See</u> Reeves Aff. (Doc. No. 56).  Reeves reports earning around $1,700-1,800 per month from Coverall, although many of his accounts were suspended due to the COVID-19 pandemic. <u>Id.</u> at ¶¶ 4-5, Ex. A.  During the pandemic, he received unemployment benefits of $586 per week through July 2020.  <u>Id.</u> at ¶ 6.  His wife earns approximately $36,000 per year as a medical assistant, and she also owns an auto repair business, which Reeves reports operated at a loss in 2019 and 2020.  <u>Id.</u> at ¶¶ 8-10, Ex. B.  Reeves and his wife hold a joint bank account which has a balance of around $11,000.  In addition, he holds a personal bank account with a balance of around $1,000, and his wife holds an account with approximately $3,110.13.  <u>Id.</u> at ¶ 11. The only other assets that Reeves reports are $1,962.64 in stocks.  <u>Id.</u> at ¶ 12.  His wife holds a retirement account totaling $6,240.10.  <u>Id.</u>

Reeves' new Affidavit also reports his expenses, including monthly expenses of $1,050 for rent, $100 for internet, $125 for car insurance, and $500-600 for family groceries.  <u>Id.</u> at ¶¶ 13-16.  Furthermore, Reeves owes approximately $5,000 in debt. <u>Id.</u> at ¶ 17.  Thus, Reeves reports a net worth of approximately $8,963, aggregating his individual bank account, his shared bank account, and his stocks, subtracting his debt,

and excluding his wife's bank account or retirement savings. His family's monthly

expenses appear to roughly match Reeves' monthly income.

## III.    LEGAL STANDARD

### A.    Standing

Article III, § 2 of the Constitution "limits the jurisdiction of federal courts to 'Cases'

and 'Controversies.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 559. Constitutional

standing developed "to ensure that federal courts do not exceed their authority as it has

been traditionally understood" by limiting "the category of litigants empowered to

maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc. v.

Robins, 578 U.S. 330, 338 (2016). In addition to constitutional standing, courts have

adopted prudential standing doctrines that further limit the exercise of federal

jurisdiction. To satisfy prudential standing, a "plaintiff generally must assert [its] own

legal rights and interests, and cannot rest [its] claim to relief on the rights or interests of

third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975); see also Am. Psychiatric Ass'n

v. Anthem Health Plans, Inc., 821 F.3d 352, 358 (2d Cir. 2016).

### B.    Federal Arbitration Act

Under the Federal Arbitration Act ("FAA"), a district court must stay judicial

proceedings when the parties have agreed to arbitrate the issues and one party has

applied for a stay. See 9 U.S.C. § 3; see also Katz v. Cellco P'ship, 794 F.3d 341, 345

(2d Cir. 2015). Such a stay remains in place "until such arbitration has been had in

accordance with the terms of the agreement, providing the applicant for the stay is not

in default in proceeding with such arbitration." 9 U.S.C. § 3.[5]  In the event of one party's

"failure, neglect, or refusal" to arbitrate, the court must compel arbitration.  9 U.S.C. § 4.

Because the FAA reflects federal policy favoring arbitration, "any doubts concerning the

scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone

Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).

## IV.    DISCUSSION

### A.    Jurisdiction Over Flores' Claims

As a threshold matter, this court lacks jurisdiction over claims asserted by or on

behalf of Flores, because she is not a party to this action.  See, e.g., Steinmetz v.

Danbury Visiting Nurse Ass'n, No. 3:19-CV-01819 (JCH), 2021 WL 4193070, at *5-6

(D.Conn. Sept. 15, 2021) (explaining that, because a non-party lacks standing to move

for relief, the court lacks jurisdiction to rule on a motion filed by a non-party).  Further,

while this matter was pled as a potential class action, the court has not certified a class,

because the court terminated the plaintiffs' Motion for Class Certification as moot in light

of its Ruling compelling arbitration.  See Order (Doc. No. 52) Terminating as Moot

Motion to Certify Class (Doc. No. 29).  Thus, Flores has no standing as a class member,

and Reeves lacks standing to assert claims on her behalf.  See, e.g., Am. Psychiatric

---

[5] Section 3 of the FAA provides in full:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

Ass'n, 821 F.3d at 358 ("a plaintiff may ordinarily assert only his own legal rights, not those of third parties" unless he acts as a "next friend"). While the court recognizes the "chicken and egg" problem that emerges for the plaintiffs—whereby they cannot move to add Ms. Flores as a party with the stay in place, but cannot use Ms. Flores' experience to advocate for lifting the stay unless she is a party—the court cannot adjudicate the rights of a person not a party to this action.

      B.    <u>Reeves' Motion to Lift the Stay (Doc. No. 54)</u>

Reeves' arguments in support of lifting the stay fall into two broad categories. First, he asks the court to, in effect, reconsider whether the cost-splitting provision in his Agreement with Coverall is unconscionable and unenforceable. <u>See</u> Pls.' Mem. at 13-17. Second, he contends that Section 3 of the FAA no longer requires the court to stay this action because (a) the arbitration has been "had" because Reeves was genuinely unable to pay the high fees, and (b) Coverall has waived its right to arbitrate. <u>See</u> <u>id.</u> at 21-26.

Coverall objects, arguing first that the court has already decided that the terms of Reeves' arbitration agreement delegate questions of arbitrability to the arbitrator and that the delegation clause in Reeves' arbitration agreement is not unconscionable. <u>See</u> Def.'s Opp'n at 9-16. In response to Reeves' second assertion, that the court should not maintain the stay under Section 3, Coverall argues that (a) Reeves has failed to make good-faith attempts to arbitrate or provide evidence of his inability to pay; and (b) Coverall has not prevented Reeves from arbitrating. <u>See</u> <u>id.</u> at 6-9.

      1.    Reconsidering the Unconscionability of Cost-Splitting Provision

This court will not rule on the unconscionability of the cost-splitting provision, as this issue has already been addressed twice: once by this court, <u>see</u> <u>Billie v. Coverall N.</u>

Am., Inc. (Billie I), 444 F. Supp. 3d 332, 349-353 (D. Conn. 2020), and once in

arbitration.  See Reeves Arbitration Order (Doc. No. 55-6).

As to this court's decision in Billie I, "[t]he standard for granting a motion

for reconsideration is strict." Ricciuti v. Gyzenis, 832 F. Supp. 2d 147, 165 (D. Conn.

2011) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); see also D.

Conn. Civ. R. 7(c)(1) ("Motions for reconsideration shall not be routinely filed and shall

satisfy the strict standard applicable to such motions.").  The three primary grounds

for reconsideration are "an intervening change of controlling law, the availability of new

evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl.

Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (internal

quotation marks and citations omitted).  The court should only grant reconsideration

"when the 'moving party can point to controlling decisions or data that the court

overlooked' and 'that might reasonably be expected to alter the conclusion reached by

the court.'" Doe v. Winchester Bd. of Educ., No. 10-CV-1179, 2017 WL 662898, at *2

(D. Conn. Feb. 17, 2017) (citing Shrader, 70 F.3d at 256–57).  Additionally, "[a] motion

for reconsideration is not a means to reargue those issues already considered when a

party does not like the way the original motion was resolved." Id. (citing Pierce v. Lee,

No. 3:08-CV-1721 (VLB), 2010 WL 4683911, at *1 (D. Conn. Nov. 4, 2010)), nor is it a

"vehicle for the introduction of new evidence that could have been presented to the

court prior to the decision of which reconsideration is sought." Jones v. Carolina Freight

Carriers Corp., 152 F.3d 918, at *1 (2d Cir. 1998) (summary order).

In Billie I, this court considered the unconscionability of the cost-splitting

provision as applied to the Agreement's delegation clause and determined that Reeves

"failed to demonstrate that the cost-sharing provision is substantively unconscionable under Connecticut law." Billie I, 444 F. Supp. 3d at 353. The court qualified its decision, however, noting that the record lacked information "regarding the size of the plaintiffs' claim against CNA, the fees plausibly expected, and the plaintiffs' financial situation." Id. Reeves has now introduced more comprehensive evidence of his financial hardship, including previously unavailable information about the high costs of arbitration and new economic duress brought on by the COVID-19 pandemic. See Reeves Aff. However, as the court held in Billie I, the arbitrator, not the court, has the authority to determine the general question of the unconscionability of cost splitting where, as here, the parties have agreed to arbitrate gateway questions of arbitrability. See Billie I, 444 F.Supp.3d at 346 (declining to address arguments that did not challenge the enforceability of the delegation clause, specifically); see also Dhue v. O'Reilly, No. 18 CIV. 2547 (DAB), 2018 WL 11222900 at *5 n.3 (S.D.N.Y. Oct. 10, 2018) ("Having already decided that the question . . . must be delegated to the arbitrator . . . this Court lacks the authority to engage in an analysis that substantially overlaps with and decides the very issue left to the arbitrator . . . .").[6]

Not only has the court determined that an arbitrator must decide the unconscionability of cost splitting, but the Arbitrator has issued an Order deciding exactly the issue in question. See Reeves Arbitration Order. The Arbitrator determined

---

[6] While the court does not reconsider its prior Ruling or the Arbitrator's Order regarding unconscionability, the court discusses the cost of arbitration and Reeves' ability to pay in Section IV(B)(2) of this Ruling in determining whether the arbitration "has been had." See pp. 22-24, infra. The court notes that the questions of the unconscionability of the cost-splitting provision and whether the arbitration "has been had" are interrelated, as both depend, in part, on the costs of arbitration and Reeves' financial circumstances.

that the AAA Commercial Rules would apply to the parties' Arbitration, and that Reeves had failed to show that requiring him to bear half of the costs would render the cost-splitting arrangement substantively unconscionable.  See id.  This court's review of an Arbitrator's decision is limited to the narrowest of circumstances.  Generally, the court gives great weight  to an arbitrator's application of the procedural rules of the arbitral tribunal, as "arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) (explaining that "'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide"); see also Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997) ("Federal courts do not superintend arbitration proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair.") (citation omitted); see also Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc., No. 20-CV-9894 (LJL), 2021 WL 2350094, at *14 (S.D.N.Y. June 8, 2021) (collecting cases).  A court will only vacate an arbitrator's procedural ruling "if the ruling denied the petitioner 'fundamental fairness'", and the arbitrator failed to "give each of the parties to a dispute an adequate opportunity to present its evidence and argument." Landmark Ventures, Inc. v. InSightec, Ltd., 63 F. Supp. 3d 343, 352 (S.D.N.Y. 2014), aff'd, 619 F. App'x 37 (2d Cir. 2015) (quotation omitted); Tempo Shain Corp., 120 F.3d at 20 (same, but not limiting fundamental fairness review to procedural rulings).

In his Order, the Arbitrator determined that the AAA Commercial Rules applied to Mr. Reeves' arbitration and the cost-sharing provision was not substantively

unconscionable.  See Reeves Arbitration Order.  Under the deferential standard of review applicable to arbitration proceedings, the court cannot determine that the Arbitrator reached his decision through a fundamentally unfair process.  Reeves briefed the cost-splitting issue in a Motion to Apply the AAA Employment Rules.  See Liss Riordan Decl. at ¶ 4; see also Reeves Aff. in Support of Motion to Apply the AAA Employment Rules (Doc. No. 61-1).  Reeves concedes that, in connection with that Motion, he had the opportunity to present evidence of his inability to pay.  See Pls.' Reply at 3 n. 2 ("Reeves did provide evidence of an inability to pay – in the form of a sworn statement, attaching the AAA form which had been accepted by the AAA itself as sufficient evidence of his inability to afford half the costs of arbitration").  Upon review of Mr. Reeves' Motion, the Arbitrator determined that Reeves did not meet his burden to show that the cost sharing provision was substantively unconscionable.  See Reeves Arbitration Order ("Mr. Reeves failed to meet his burden on the claim of substantive unconscionability due to the cost sharing provision . . . Mr. Reeves claims, without supporting evidence, that bearing one-half of the costs of the arbitrator's fees would make it prohibitively expensive . . . . He provides no support for . . . [his] statement [that arbitration will cost tens of thousands of dollars].").  The Arbitrator's decision that the fee sharing arrangement is not unconscionable bars this court from reaching an alternative conclusion.  To do so would be to overstep the deference that courts grant to arbitral decisions.  Thus, this court cannot reconsider the issue of unconscionability, which was submitted to and determined by the Arbitrator.

> 2. Section 3 of the FAA

Reeves also contends that the court should lift the stay pursuant to Section 3 of the FAA.

Generally, the FAA reflects a "strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. American Express Co., 547 F.3d 137, 142 (2d Cir. 2008).  Nonetheless, courts in several circuits have "mapped out a path, albeit narrow", to lifting a stay and permitting parties to return to court from arbitration. CellInfo, LLC v. Am. Tower Corp., 506 F. Supp. 3d 61, 65 (D. Mass. 2020).  When the district court stays litigation pending arbitration, Section 3 mandates that the stay remain in place until: (1) "such arbitration has been had in accordance with the terms of the agreement"; or (2) "the applicant for the stay is . . . in default in proceeding with such arbitration." 9 U.S.C. § 3.  Thus, if arbitration "has been had" or the stay applicant has failed to proceed with arbitration, the court may lift the stay.

In the instant case, Reeves argues that his arbitration "has been had" and Coverall is in default, justifying lifting the stay.

a. Whether the Arbitration "Has Been Had in Accordance with the Agreement"

Reeves contends that this court can and should lift the stay because the arbitration "has been had" for the purposes of Section 3.  See Pls.' Mem. at 21.

Courts have found that an arbitration "'has been had' in accordance with  the terms of the agreement" when arbitral proceedings began according to the rules in the parties' agreements before being terminated for a party's failure to pay, even if no final award issued.  See Cota v. Art Brand Studios, LLC, No. 21-CV-1519 (LJL), 2021 WL 4864588, at *11-12 (S.D.N.Y. Oct. 15, 2021) (determining an arbitration had been "had" and denying a defendant's motion to compel arbitration when arbitration terminated after one party declined to cover fees owed by the opposing party) (collecting cases); Tillman v. Tillman, 825 F.3d 1069 (9th Cir. 2016) (lifting a stay and finding that

arbitration had been "had" when the parties' agreement incorporated the AAA's rules, one party was unable to pay the requisite fees, and the arbitrator terminated the proceedings pursuant to the AAA's rules); <u>Freeman v. SmartPay Leasing</u>, LLC, 771 F. App'x 926, 935 (11th Cir. 2019) (determining that the district court did not err determining arbitration had been "had" and lifting a stay where "no arbitration award was awarded", but the plaintiff "initiated an arbitration that was terminated by [the Arbitral body] after [the defendant] failed to pay the filing fee" requested by the Arbitral body); <u>cf.</u> <u>CellInfo, LLC v. Am. Tower Corp.</u>, 506 F. Supp. 3d 61, 65-67, 72-73 (D.Mass. 2020) (adopting <u>Tillman</u>'s reasoning but determining that arbitration had not been "had" and declining to lift a stay where the plaintiff failed to show a good-faith effort to comply with the requirements of the arbitral body). In each of these cases, courts have held that arbitration may be "had in accordance with the agreement" where two conditions have been met: (a) the arbitration—in conformity with procedures laid out in the relevant agreement and arbitral rules—began, transpired in part, and concluded when one party's failed to pay; and (b) the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration.

As the court discusses in the following sections, the arbitration between Reeves and Coverall satisfied both of these conditions, as (a) the arbitration followed the terms of his Agreement and the AAA's Commercial Rules; and (b) he made a good-faith effort to arbitrate before facing costs that he has shown he could not afford.

                    i.    "In Accordance with the Agreement"

The decisions of several courts considering when arbitration "has been had" for the purposes of Section 3 of the FAA demonstrate that Reeves' arbitration, though cut short by his inability to pay, took place in accordance with his Agreement with Coverall.

In <u>Tillman</u>, the case upon which Reeves relies most heavily, the district court granted the defendant law firm's motion compelling the individual plaintiff to arbitrate. <u>Tillman</u>, 825 F.3d at 1072-73. Although the plaintiff arbitrated the initial stages of the dispute, she eventually ran out of funds and notified the AAA of her inability to pay. <u>Id.</u> at 1072. The AAA "inquir[ed] as to whether [the firm was] willing to cover th[e] deposit", but the firm declined. <u>Id.</u> When the deposit was not submitted, the arbitrator terminated arbitration. <u>Id.</u> at 1072-74. The plaintiff returned to the district court, where the judge lifted the stay. <u>Id</u>. at 1074-75. The Ninth Circuit upheld the district court's decision, clarifying that lifting the stay was appropriate because the arbitration "had been had in accordance with the terms of the agreement" as the plaintiff had not "fail[ed], neglect[ed], or refus[ed]" to arbitrate. <u>See id.</u> at 1073-76.

The Ninth Circuit determined that arbitration "had been had" in <u>Tillman</u> where the arbitration agreement incorporated the rules of the AAA, which allow for a termination of proceedings upon non-payment of fees. <u>See</u> 825 F.3d at 1074. As the <u>Tillman</u> court explained the "agreement between [the plaintiff] and [the defendant] firm explicitly incorporated the AAA's rules", and the arbitration proceeded and was terminated in accordance with those rules:

> "Rule R-53 allows the AAA to prescribe fees and gives it the sole discretion to reduce fees in the event of hardship . . . . Rule R-56 allows the AAA to require the parties to pay deposits in advance in "such sums of money as it deems necessary." . . . . Rule R-57 states that in the event of nonpayment, the arbitrator . . . "may order the suspension of the arbitration." . . . . If such suspension has occurred and the parties still fail to make full deposits within a designated time period, the arbitrator "may terminate the proceedings."

825 F.3d at 1074. Because "[a]ll these steps were followed . . . including terminating the proceedings without issuance of an award", the Ninth Circuit determined that

"arbitration had 'been had' pursuant to the agreement between the firm and [the plaintiff], the district properly lifted the stay." See also Pre–Paid Legal Services, Inc. v. Cahill, 786 F.3d 1287, 1293–94 (10th Cir. 2015).

A district court in this Circuit recently adopted similar reasoning to that of the Tillman court, concluding that arbitration has been "had" in accordance with the parties' agreements when: (1) the agreements "required the parties to submit their dispute to arbitration before the AAA 'in accordance with the rules of the American Arbitration Association then in effect'", but did not specify who was to pay the fees; (2) "Rule R-57 of the AAA then in effect provided that if the fees 'have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.'"; (3) The AAA informed the parties that one party could make a payment on behalf of the non-paying party to avoid interrupting the proceeding; (4) Neither party made the required payment; and (5) the arbitration was terminated. See Cota, 2021 WL 4864588, at *11-12 (denying the defendant's Motion to Compel Arbitration because arbitration had been "had").

Here, as in Tillman and Cota, the Agreement between Reeves and Coverall required the parties to arbitrate before the AAA under the Association's Commercial Rules. See Reeves Agreement at ¶ 21(a). Reeves' Agreement also provided that the "costs of arbitration shall be shared equally between the Parties . . . .", and that "[e]ither party, in their sole and exclusive discretion, may choose to assume responsibility for the other Party's arbitration costs." See Reeves Release at § 4(d). Under the AAA Rules applicable to Reeves and Coverall's Arbitration, Rule 53 allows the AAA to "defer or reduce administrative fees" "in the event of extreme hardship." Rule 56(a) allows the

AAA to require the parties to deposit sums "as it deems necessary . . . including the arbitrator's fee . . . ." See AAA Commercial Rules. If such charges are not paid in full, Rule 57 permits the AAA to "inform the parties" so that "one of them may advance the required payment." Id. In the event that fees are not paid, the arbitrator may terminate the arbitration. Id.

Like the proceedings in Tillman and Cota, Reeves' arbitration began pursuant to his Agreement with Coverall and the AAA Rules incorporated therein. Reeves applied for and was granted a hardship waiver under Rule 53 of the Commercial Rules. See Liss-Riordan Decl. at Ex. A. He then challenged the application of the Commercial Rules but continued participating in the arbitration by submitting briefing, responding to discovery requests, and meeting and conferring. See Liss-Riordan Decl. at ¶ 4. The Arbitrator denied his request to reapportion the fees or invalidate the cost-splitting provision in his Agreement, then billed Reeves $3,937.50 as permitted by Rule 56(a). See id. at Ex. G. When neither Reeves nor Coverall paid the requisite fees, the AAA notified both parties of the deficiencies. See id. Keeping with his consistent assertions that he was unable to afford high arbitral fees, Reeves notified Coverall's Counsel and the AAA of his inability to pay the deposit. See Kurtz Decl. at Ex. B. Coverall did not advance the payment, although both Commercial Rule 57 and the terms of Reeves' Agreement allow for one party to cover the other's costs. See AAA Commercial Rules; Reeves Release at § 4(c). Without the requisite payment, the Arbitrator terminated the case as permitted by Rule 57. See Liss-Riordan Decl. at Ex. H.

Because the Arbitration between Reeves and Coverall commenced and concluded in accordance with the terms of their Agreement, which incorporated the

Commercial Rules of the AAA, the Arbitration "has been had in accordance with the terms of the agreement" as required by Section 3 of the FAA.

ii. Whether Reeves' Failure to Pay was In Good Faith

While Reeves' arbitration unfolded in conformity with the terms of his Agreement and AAA's rules, he must also show that he made a good-faith attempt to arbitrate.

As the <u>Tillman</u> court and others to consider the issue have made clear, a party may not manipulate its way back into court by withholding payments despite its ability to pay. In <u>Tillman</u>, the Ninth Circuit determined that both Sections 3 and 4[7] of the FAA bar the district court from providing relief to a party who <u>chooses</u> not to pay for arbitration. In such a situation, "the district court probably could . . . compel arbitration under the FAA's provision allowing such an order in the event of a party's 'failure, neglect, or refusal' to arbitrate." <u>See</u> <u>Tillman</u>, 825 F.3d at 1075–76 (quoting 9 U.S.C. § 4.). As the <u>Tillman</u> court elaborated:

> A question may arise in such circumstances as to whether an arbitration "has been had in accordance with the terms of the agreement," 9 U.S.C. § 3, when it has been terminated due to the nonpayment of a party who has the ability to pay but simply chooses not to. Even if such an arbitration has been terminated in accordance with the rules governing the arbitration, as Tillman's arbitration was here, it may be contrary to "the structure and purpose of the FAA" to allow a party to an arbitration agreement to benefit from their intentional noncompliance with an arbitrator's rules. <u>Sink v. Aden</u>

---

[7] Section 4 of the FAA provides in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . .

9 U.S.C. § 4.

> Enters., 352 F.3d 1197, 1200 (9th Cir. 2003). But because Tillman was unable to pay, gave notice of her inability to pay during arbitration, and "made genuine efforts to make alternate payment arrangements," id. at 1199, we need not decide how to construe 9 U.S.C. §§ 3 and 4 in the event of a party's willful nonpayment of an arbitrator's fees.

Tillman, 825 F.3d at 1076 n. 1; see also Cellinfo, 506 F.Supp.3d at 66-67 (collecting cases supporting the lifting of a stay only upon a "satisfactory showing that the non-paying party acted in good faith and under a genuine indigency"); Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1294 (10th Cir. 2015) (declining to grant a party's motion to maintain a stay under Section 3 after he failed to pay arbitration fees but did not "show he was unable to afford payment, ask the arbitrators to modify his payment schedule, or move for an order requiring [the defendant] to pay his share for him so that arbitration could continue."); but see Cota, 2021 WL 4864588, at *11-12 (determining that arbitration had "been had" without considering whether the non-paying party made good faith efforts to arbitrate or showed a genuine inability to pay). As the CellInfo court elaborates, "a party should do more than simply show empty pockets. Rather, it must show that it diligently arbitrated, that it sought alternative funds but failed, that it attempted to adjust payment, get a discount or delay from the AAA, that it did not drag foot without action, that it made reasonable efforts to arbitrate in good faith." 506 F.Supp.3d at 61; see also Pre-Paid Legal Servs., Inc., 786 F.3d at 1294.

Here, Reeves has shown more than "empty pockets." First, he has offered evidence that he lacks the resources to pay for arbitration.[8] By this court's accounting based on Reeves' Affidavit, the $3,937.50 charge for arbitrators' fees would have

---

[8] One court in this Circuit recently determined that arbitration had "been had" without considering evidence of the non-paying parties' ability to pay. See Cota, 2021 WL 4864588, at *11-12.

drained approximately forty-four percent of Reeves' $8,963 net worth.  See pp. 5-6,

infra.[9]  Further, he was asked to make this payment at a time when his income from his

janitorial work for Coverall had decreased due to the COVID-19 pandemic.  See Reeves

Aff. at ¶¶ 4,7.  During the same period, he qualified for Unemployment Insurance

benefits because several of his cleaning accounts were cancelled.  See Reeves

Hardship Waiver Application (Doc. No. 61-1).  The AAA itself found that Reeves did not

have sufficient financial means to pay their administrative fees.  AAA Email Granting

Hardship Waiver (Doc. No. 55-1 at 2).[10]  Finally, there is no indication that Reeves'

financial status was indicative of an attempt to hide assets or act in bad faith.[11]

---

[9] The parties dispute whether this $3,937.50 charge would have represented the entirety of the Arbitrator's fees for the full arbitration, or whether the charge was merely the fee for the Arbitrator's time spent scheduling proceedings and deciding the threshold fee-splitting question. See Reeves Mem. in Support of Mot. at 16-17 (contending that the costs of the overall proceeding would have been higher); Coverall Opp'n at 14-15 (arguing that the $3,937.50 charge represented the anticipated arbitrator fees for the entire arbitration). The record is not clear as to whether the arbitrator would have sought additional compensation had the proceedings continued.  However, the court's analysis in the following pages applies even if the $3,937.50 charge would have represented the entire cost Reeves would have needed to incur to arbitrate.

[10] While the Arbitrator, citing this court, found that Reeves "failed to meet his burden on the claim of substantive unconscionability due to the cost sharing provision", see Reeves Arbitration Order, the present question is not one of the substantive unconscionability of the Agreement, but one of Reeves' ability to pay and his good faith in attempting to secure payments. See, e.g., Tillman v. Tillman, No. CV 09-2017-VAP (RCX), 2013 WL 12113443, at *3 (C.D. Cal. July 12, 2013), aff'd, 825 F.3d 1069 (9th Cir. 2016) (finding that the plaintiff lacked the resources to deposit the arbitration fee without discussing unconscionability).

[11] The court is wary of the potential for parties to arbitration to abuse the "good faith" standard by seeking to avoid arbitration obligations by deceptively declining to disclose assets. Here, Reeves, a janitorial worker, has obtained a hardship waiver, accepted Unemployment Insurance benefits, and submitted a financial affidavit.  No countervailing evidence indicates that he has fabricated his financial status to avoid arbitrating the dispute.

For the sake of comparison, in Tillman, the plaintiff received $3,073,555.35 in a jury award, putting aside $150,000 each for two of her daughters and $150,000 for a third individual. See Declaration of Renee Tillman, Tillman v. Tillman, CV-09-02017-VAP (Doc. No. 280-1). After paying off her bills and mortgage, she held $2,500,000, which she invested. Id. She then gifted her husband $225,000 and lost $525,000 in penalties, fees, and bad investments. Id. She bought four vehicles for her family for $70,000, paid off her stepmother's car, and helped family members with bills. Id. She paid for $75,000 of improvements to her property, spent $10,000 on dental work, and donated $10,000 to local charities. Id. However, the remainder of her funds dried up when she incurred legal fees to defend a lawsuit and paid

Indeed Reeves' financial circumstances are comparable to those of plaintiffs in cases in which courts have struck down arbitration agreements because of prohibitive arbitration costs. While, on the incomplete record before this court in Billie I, the court noted that "[e]ach of these cases[, including Andresen v. IntePros Federal, Inc, Haro v. NCR Corporation, and Shankle v. B-G Maint. Mgmt. of Colorado, Inc.,] involved more complete records and higher fees than the record and fees in this case", the present more developed record evidences that Reeves faces greater financial hardship than the plaintiffs in some of those cases:

> In Andresen v. IntePros Federal, Inc., the court relied upon "the undisputed $7,500 filing fee" and concluded that, this fee "standing alone, is more than sufficient to demonstrate cost-prohibitiveness when measured against Dr. Andresen's modest financial circumstances." 240 F. Supp. 3d 143, 159 (D.D.C. 2017) [(finding that Dr. Anderson was "earning a monthly income that marginally exceeds her monthly outlays, has some money in savings and retirement accounts, and has a real property asset that—if there is a willing buyer—might offset her debt")]. In Haro v. NCR Corporation, the plaintiff, who alleged wrongful termination, submitted evidence stating he had received an annual salary of $73,713. 2005 WL 8153979, at *5 (S.D. Ohio July 26, 2005). Based upon the size of this claim, the court relied upon one study that found that the arbitration costs for an $80,000 arbitration claim ranged from $4,350 to $11,350. Id. . . . See also Shankle v. B-G Maint. Mgmt. of Colorado, Inc., 163 F.3d 1230, 1234–35 (10th Cir. 1999) (estimating the cost of arbitration to be between $1,875 and $5,000).

Billie I, 444 F. Supp. 3d at 352–53. As the Andresen court rightly explained, where a plaintiff has to balance expenses and a modest salary, savings, and retirement account,

---

out $13,937.50 in arbitration fees. Id. She lacked the money in her checking account to cover the fees, and she and her husband were living on approximately $1,489 of monthly Social Security disability benefits. Id. She maintained equity in her land, her trailer, and the vehicles she had purchased, but the court determined that she was incapable of paying additional arbitration fees of $18,562.50. Id.

While the record in Tillman indicates that the plaintiff had less cash on hand than Reeves by the time arbitration fees came due, both plaintiffs faced costs beyond their means to pay. As the court discusses below, see p. 22, infra, it cannot be the case that a "good faith" effort to pay arbitration fees requires a plaintiff to drive himself to the brink of bankruptcy.

"a potential multi-thousand dollar expense is prohibitive." <u>Andresen</u>, 240 F. Supp. 3d at 158–59. This court agrees and concludes that Reeves has shown that he made reasonable attempts to arbitrate in good faith, notwithstanding his reluctance to spend nearly half of his net worth on arbitration fees. To "demand that [Reeves] . . . run the risk of depleting [his] savings and dipping into [his] modest retirement funds" is "quite simply, preposterous." <u>See</u> <u>id.</u>[12]

Second, Reeves has exerted diligent efforts to arbitrate, participating in discovery until he received the $3,937.50 charge. While the steep bill led Reeves to inform Coverall and the AAA that he could no longer proceed in arbitration, he made real attempts to secure funds from the outset of the dispute. He tried and failed to obtain a more favorable fee arrangement in front of this court and the arbitrator. He applied for and obtained a hardship fee waiver. <u>See</u> Reeves Hardship Waiver Application. Throughout the proceedings, he put both Coverall and the AAA on notice of his limited resources. Reeves did not "fail[ ], neglect, or refus[e]" to arbitrate, <u>see</u> 9 U.S.C. § 4, but rather "gave notice of [his] inability to pay during arbitration" and "made genuine efforts to make alternate payment arrangements." <u>Tillman</u>, 825 F.3d at 1075 n.1; <u>cf.</u> <u>CellInfo</u>,

---

[12] Courts often consider the question of litigants' ability to pay fees in the context of motions to proceed in forma pauperis under section 1915(a) of title 28 of the United States Code. As the Second Circuit has made clear, a litigant may qualify to have his court filing fees waived without "demonstrat[ing] absolute destitution; no party must be made to choose between abandoning a potentially meritorious claim or foregoing the necessities of life." <u>Potnick v. E. State Hosp.</u>, 701 F.2d 243, 244 (2d Cir. 1983). While filing fees are generally lower in court than before arbitral bodies, courts have granted in forma pauperis status to plaintiffs with financial circumstances comparable to Reeves'. <u>See, e.g.</u>, <u>Billie v. Deutsche Bank Tr. Co.</u>, No. 3:18CV01176(AWT), 2018 WL 10579837, at *2 (D. Conn. Sept. 14, 2018), <u>report and recommendation adopted</u>, No. 3:18CV1176(AWT), 2018 WL 10579825 (D. Conn. Oct. 24, 2018) (granting in forma pauperis status to a plaintiff with a net income of $3,000 per month, no liquid assets, and two properties with outstanding mortgages in excess of the property value); <u>Rogers v. United States</u>, 248 F. App'x 402, 402–03 (3d Cir. 2007) (granting in forma pauperis status to a plaintiff when "the District Court filing fee was more than half of his monthly income"); <u>Garcia v. Cole</u>, 428 F. Supp. 3d 644, 654 (D.N.M. 2019) (granting in forma pauperis status to a plaintiff with a monthly income of $1,600, average monthly expense of $1,475, no bank account, and a dependent daughter).

506 F. Supp. 3d at 72 (finding a party failed to arbitrate where its "inaction differentiate[d] it from Tillman").

Because Reeves genuinely could not afford the arbitrator's fees, but made diligent efforts to arbitrate in good faith before the arbitration terminated, the arbitration "has been had in accordance with the agreement" under Section 3 of the FAA.

> b.     <u>Whether Coverall Is "In Default In Proceeding" With the Arbitration</u>

In addition to arguing that the arbitration "has been had", Reeves also contends that Coverall waived its right to arbitrate by refusing to advance his fees. Pls.' Mem. at 21-26. He asserts that Coverall was thus "in default in proceeding with [the] arbitration" under Section 3 of the FAA. <u>See</u> 9 U.S.C. § 3.

Generally, "[t]here is a strong presumption in favor of arbitration, and waiver of the right to arbitration is not to be lightly inferred." <u>Thyssen, Inc. v. Calypso Shipping Corp., S.A.</u>, 310 F.3d 102, 104–05 (2d Cir. 2002) (citation and internal alterations omitted). However, "[a]n inquiry into whether an arbitration right has been waived is factually specific and not susceptible to bright line rules." <u>Id.</u> at 105. The Second Circuit has equated a waiver of the right to arbitrate with a "default in proceeding with such arbitration" under Section 3 of the FAA. <u>See, e.g.</u>, <u>Doctor's Assocs., Inc. v. Distajo</u>, 66 F.3d 438, 455 (2d Cir. 1995). Courts in this and other Circuits have determined that an applicant for a stay may default by failing to pay arbitration fees. <u>See, e.g.</u>, <u>Cota</u>, 2021 WL 4864588 at *9 (collecting cases); <u>SmartPay</u>, 771 F. App'x at 932, 935 (determining that a party defaulted and "waived its right to arbitration by failing to pay arbitration fees" under a different arbitral body's Consumer Minimum Standards); <u>Pre-Paid Legal Servs.</u>, 786 F.3d at 1294 (10th Cir. 2015) ("Failure to pay arbitration fees constitutes a 'default'

under § 3.").  To show waiver on the basis of a refusal to arbitrate "courts in this Circuit have required a showing that the defendant (i) engaged in conduct that is inconsistent with the right to arbitrate that (ii) prejudiced the plaintiff." Stanley v. A Better Way Wholesale Autos, Inc., No. 3:17-CV-01215-MPS, 2018 WL 3872156, at *6 (D.Conn. Aug. 15, 2018) (internal citation omitted).

    i.    Conduct Inconsistent With the Right to Arbitrate

Coverall's refusal to advance Reeves' portion of the arbitrator's compensation constituted "conduct inconsistent with the right to arbitrate." Id.

As the district court held in Cota, a party may engage in "conduct inconsistent with the right to arbitrate" when it refuses to advance another party's fees if such a refusal ends the arbitration.  See 2021 WL 4864588 at *9-11.  In that case, the defendant, Art Brand, filed a demand for arbitration against the plaintiff artists pursuant to an arbitration agreement.  Id. at 9.  The plaintiff artists filed twenty-two counterclaims, and Art Brand asked the arbitral panel to dismiss those counterclaims.  Id.  The panel declined Art Brand's request and issued an order that would terminate the whole arbitration if full payment was not made.  Id.  That order gave Art Brand the right to pay the fees for both parties if it wanted to continue the arbitration.  Id.  As the district court reasoned, "[t]hereafter, Art Brand had a choice—it could pay both fees if it wanted to prosecute the claims and take the risk that it might never be able to recover the share of fees owed by the Artists or it could elect not to pay either set of fees and allow the arbitration . . . to terminate."  Id.  Art Brand chose the latter, knowing that the arbitration would terminate, and thus "acted inconsistently with its arbitration right."  Id.

The Cota court reached this conclusion in spite of the fact that the arbitral panel "never directed or ordered [Art Brand] to advance the full costs of the arbitration." Id.  at

10.  "The key factor", the court reasoned, is "whether the party fails to take that action available to it to keep the arbitration alive and thus acts inconsistently with the right to arbitrate, causing prejudice to the other side." Id.  In effect, if a party seeks to compel arbitration, then refuses an opportunity to advance costs to ensure that the arbitration takes place, it acts inconsistently with its contractual arbitration right.

Coverall's refusal to pay Reeves' fees, like that of Art Brand, was "inconsistent with the right to arbitrate." Id.  While neither party has submitted evidence that the AAA requested or ordered that Coverall pay Reeves' expenses, AAA informed both Reeves and Coverall that neither party had paid their requisite deposits.  See Liss-Riordan Decl. at Ex. G.  Both parties, therefore, were aware of the shortfall and the arbitration's possible end if funds were not received.  Id.  ("If the outstanding balance is not brought current . . . The arbitrator may suspend or terminate the case").  Coverall was on notice of the impending termination of the arbitration and of Reeves' claim that he was unable to pay.  In such a situation, both the AAA Rules and Reeves' Agreement provided that Coverall had the opportunity to cover Reeves' costs and continue the arbitration.  See Reeves Release at ¶¶ 4(c) ("either party, in their sole and exclusive discretion, may choose to assume responsibility for the other Party's arbitration costs") & 4(h) ("the prevailing party shall be entitled to reimbursement by the other Party of all litigation and arbitration costs, including attorneys' fees."); see also AAA Commercial Rule 57 ("If arbitrator compensation . . . [has] not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment").

Coverall could have advanced Reeves' fees under Commercial Rule 57; indeed, it concedes that it has previously paid claimants' arbitrator fees.  See Jamie Kurtz Decl.

at Ex. C.  Furthermore, Coverall was aware of Reeves claim that he could not afford the

arbitrator's fees.  Reeves had requested the application of the lower-fee Employment

Fee Schedule from the outset of the dispute, as Coverall acknowledged at oral

argument before this court.  <u>See</u> Oral Argument Transcript (Doc. No. 53). Furthermore,

during oral argument, counsel for Coverall made representations that Coverall would be

willing to pay Reeves' fees:

> THE COURT: What about when the case is over? He's got to pay that single
> arbitrator how much an hour under Triple A?
>
> MR. LEON: If we're talking about the enforceability on the delegation clause
> as the first hurdle, we have to get past, the question as to whether or not
> additional fees would somehow be an impediment to arbitration, that's a
> question for the arbitrator. I think the first hurdle we need to get over if the
> Court were to find the delegation clause unenforceable, I don't think there's
> a predicate for finding that on this record at all. <u>And I will also make a
> representation to the Court. If the Triple A determines based upon an
> adequate showing from the plaintiffs that they cannot afford the cost of
> arbitration, we will front them.</u>

<u>Id.</u>

Coverall failed to follow through on that representation.  Although the AAA

granted Reeves a hardship waiver, acknowledging that he could not afford arbitration's

high costs, Coverall did not offer to cover Reeves' portion of the arbitrator's fees.  <u>See</u>

Liss-Riordan Decl. at Ex. A.  Rather, Coverall continued to seek to apply the

Commercial Rules, opposing Reeves' Motion to apply the lower-cost Employment

Rules.  <u>Id.</u> at Ex. F.  The Arbitrator's eventual Ruling—that there was not sufficient

evidence to warrant applying the AAA Employment Rules—left Reeves facing a fee he

could not pay, and effectively ended the arbitration.  <u>Id.</u> at Ex. F.  While Coverall could

have advanced Reeves' costs to "keep the arbitration alive", <u>see</u> <u>Cota</u>, 2021 WL

4864588 at *10, Coverall declined to do so.[13]  Because Coverall refused the opportunity to advance Reeves' fees to ensure that arbitration would continue, Coverall acted inconsistently with its right to arbitrate, let alone its representation to the court.

ii.  Prejudice to the Plaintiff

To determine that Coverall waived its right to arbitrate, the court must also consider whether Reeves was prejudiced by Coverall's actions.  See Stanley, 2018 WL 3872156 at *6.  Here, Reeves was plainly prejudiced, as he faced a delay in adjudicating his claims and lost his opportunity to arbitrate in the forum selected by the parties.  See, e.g., id. at *7 (finding prejudice where one party incurred "costs involved in submitting a doomed AAA demand for arbitration, in filing its district court complaint, and in defending a motion to compel"); SmartPay, 771 F. F.App'x at 933. Having acted inconsistent with its right to arbitrate by failing to advance payment, Coverall caused prejudice to Reeves, and thus it met both prongs of the test for waiver. See Stanley, 2018 WL 3872156 at *6. Because Coverall waived its right to arbitrate, it was "in default in proceeding" with the arbitration under Section 3 of the FAA. See Cota, 2021 WL 4864588 at *9; 9 U.S.C. § 3.

Section 3 mandates that the stay remain in place only until arbitration "has been had in accordance with the terms of [Reeves'] [A]greement" and "the applicant for the stay[, Coverall,] is . . . in default in proceeding with such arbitration." 9 U.S.C. § 3.  The court having determined that both conditions have been met, there is no basis for a stay of Reeves' claims remaining under Section 3 of the FAA.

---

[13] Coverall also appears to have failed to make its own $2,562.50 deposit. See Liss-Riordan Decl. at Ex. G.

3.       After Lifting the Stay

Having concluded that Section 3 of the FAA no longer authorizes or mandates a stay of Reeves' claims, the court turns to the question of how to proceed.[14]

First, the Arbitrator issued no final award, but terminated the Arbitration before reaching the merits of the dispute.  Thus, the court cannot rely on Sections 9 through 11 of the FAA, which instruct district courts to enforce, vacate, or modify arbitration awards.  See 9 U.S.C. §§ 9-11.  Furthermore, neither party has moved again to compel arbitration and, even on such a Motion, the "district court can[not] force an independent arbitration organization such as the AAA to ignore its own rules and re-open a case that it has previously closed." Cota, 2021 WL 4864588 at *11.

Coverall urges the court to dismiss Reeves from the case for failure to comply with the court's Order to Arbitrate under Federal Rule of Civil Procedure 41(b).  See Def.'s Opp'n at 9,17.  However, here, as in Tillman, Coverall has failed to identify any section of the FAA that would compel dismissal of Reeves' claims on the basis of his inability to pay.  See 825 F.3d at 1075.[15] Thus, the court will not dismiss Reeves.

Finally, the plaintiffs ask the court to allow them to proceed with their claims in court.  A district court has a duty to "adjudicate a controversy properly before it."  See

---

[14]  While Billie's claims are still being arbitrated, the court may exercise its discretion as to whether to continue to stay Reeves' claims. See Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008) ("[I]f some, but not all, of the claims in the case are arbitrable, [a court] must then decide whether to stay the balance of the proceedings pending arbitration."). Because Billie's arbitration has no preclusive effect on Reeves' claims, the court will not stay proceedings as to Reeves on the basis of Billie's ongoing arbitration. See Billie Agreement at ¶ 21(A)(11) (Doc. No. 27-1).

[15] Furthermore, no Motion to Dismiss has been filed, and the parties have not had the opportunity to brief such a Motion. The court recognizes that Rule 41(b) "gives district courts the authority to dismiss cases,  . . . sua sponte, if a plaintiff fails to comply with court orders and/or fails to prosecute an action pending in a district court." Shetiwy v. Midland Credit Mgmt., No. 12 Civ. 7068 (RJS), 2016 WL 4030488, at *1 (S.D.N.Y. July 25, 2016), aff'd, 706 F. App'x 30 (2d Cir. 2017) (summary order). However, the court will not dismiss Reeves sua sponte, as no basis for dismissal appears to exist.

<u>Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.</u>, 673 F.3d 84, 100 (2d Cir. 2012) (citing <u>Colorado River Water Conservation Dist. v. U.S.</u>, 424 U.S. 800, 813 (1976)).  Thus, given that no justification for a stay of Reeves' claims remains, and the dispute is before this court after arbitration "has been had", the court will lift the stay as to Reeves' claims and administratively reopen the case.  <u>See</u> <u>Tillman</u> 825 F.3d at 1076; <u>Cota</u>, 2021 WL 4864588 at *12 (denying the Defendant's Motion to Compel Arbitration because arbitration had "been had", then adjudicating the Defendant's Motion to Dismiss).

**V.    CONCLUSION**

For the foregoing reasons, the plaintiffs' Motion to Lift the Stay (Doc. No. 54) is granted in part.  The court lifts the stay as to plaintiff Reeves' claims against Coverall.  Plaintiff Billie's claims will remain stayed pending the outcome of his arbitration before the AAA. The parties are ordered to confer and propose a Rule 26(f) Scheduling Order within 21 days of this Ruling.

SO ORDERED.

Dated at New Haven, Connecticut this 16th day of March, 2022.


   /s/ Janet C. Hall
Janet C. Hall
United States District Judge

# Commercial

## Arbitration Rules and Mediation Procedures

**Including Procedures for Large, Complex Commercial Disputes**



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/commercial**

Rules Amended and Effective October 1, 2013
Fee Schedule Amended and Effective July 1, 2016

SPA 31

the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

## R-55. Neutral Arbitrator's Compensation

**(a)** Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

**(b)** If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

**(c)** Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

## R-56. Deposits

**(a)** The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

**(b)** Other than in cases where the arbitrator serves for a flat fee, deposit amounts requested will be based on estimates provided by the arbitrator. The arbitrator will determine the estimated amount of deposits using the information provided by the parties with respect to the complexity of each case.

**(c)** Upon the request of any party, the AAA shall request from the arbitrator an itemization or explanation for the arbitrator's request for deposits.

## R-57. Remedies for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.

**(a)** Upon receipt of information from the AAA that payment for administrative charges or deposits for arbitrator compensation have not been paid in full, to the extent the law allows, a party may request that the arbitrator take specific measures relating to a party's non-payment.

**(b)** Such measures may include, but are not limited to, limiting a party's ability to assert or pursue their claim. In no event, however, shall a party be precluded from defending a claim or counterclaim.

**(c)** The arbitrator must provide the party opposing a request for such measures with the opportunity to respond prior to making any ruling regarding the same.

**(d)** In the event that the arbitrator grants any request for relief which limits any party's participation in the arbitration, the arbitrator shall require the party who is making a claim and who has made appropriate payments to submit such evidence as the arbitrator may require for the making of an award.

**(e)** Upon receipt of information from the AAA that full payments have not been received, the arbitrator, on the arbitrator's own initiative or at the request of the AAA or a party, may order the suspension of the arbitration. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

**(f)** If the arbitration has been suspended by either the AAA or the arbitrator and the parties have failed to make the full deposits requested within the time provided after the suspension, the arbitrator, or the AAA if an arbitrator has not been appointed, may terminate the proceedings.

## R-58. Sanctions

**(a)** The arbitrator may, upon a party's request, order appropriate sanctions where a party fails to comply with its obligations under these rules or with an order of the arbitrator. In the event that the arbitrator enters a sanction that limits any party's participation in the arbitration or results in an adverse determination of an issue or issues, the arbitrator shall explain that order in writing and shall require the submission of evidence and legal argument prior to making of an award. The arbitrator may not enter a default award as a sanction.

**(b)** The arbitrator must provide a party that is subject to a sanction request with the opportunity to respond prior to making any determination regarding the sanctions application.

Rules Amended and Effective October 1, 2013. Fee Schedule Amended and Effective July 1, 2016.

KeyCite citing references available

| United States Code Annotated |
| Title 9. Arbitration (Refs & Annos) |
| Chapter 1. General Provisions (Refs & Annos) |

9 U.S.C.A. § 3

## § 3. Stay of proceedings where issue therein referable to arbitration

Currentness

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

**CREDIT(S)**

(July 30, 1947, c. 392, 61 Stat. 670.)

Notes of Decisions (887)

9 U.S.C.A. § 3, 9 USCA § 3
Current through P.L. 117-154. Some statute sections may be more current, see credits for details

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

C KeyCite citing references available

| United States Code Annotated |
| Title 9. Arbitration (Refs & Annos) |
| Chapter 1. General Provisions (Refs & Annos) |

9 U.S.C.A. § 16

# § 16. Appeals

Currentness

**(a)** An appeal may be taken from--

**(1)** an order--

**(A)** refusing a stay of any action under section 3 of this title,

**(B)** denying a petition under section 4 of this title to order arbitration to proceed,

**(C)** denying an application under section 206 of this title to compel arbitration,

**(D)** confirming or denying confirmation of an award or partial award, or

**(E)** modifying, correcting, or vacating an award;

**(2)** an interlocutory order granting, continuing, or modifying an injunction against an arbitration that is subject to this title; or

**(3)** a final decision with respect to an arbitration that is subject to this title.

**(b)** Except as otherwise provided in section 1292(b) of title 28, an appeal may not be taken from an interlocutory order--

**(1)** granting a stay of any action under section 3 of this title;

**(2)** directing arbitration to proceed under section 4 of this title;

**(3)** compelling arbitration under section 206 of this title; or

**(4)** refusing to enjoin an arbitration that is subject to this title.

**CREDIT(S)**

(Added Pub.L. 100-702, Title X, § 1019(a), Nov. 19, 1988, 102 Stat. 4670, § 15; renumbered § 16, Pub.L. 101-650, Title III, § 325(a)(1), Dec. 1, 1990, 104 Stat. 5120.)

Notes of Decisions (260)

9 U.S.C.A. § 16, 9 USCA § 16
Current through P.L. 117-154. Some statute sections may be more current, see credits for details

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SPA 36

C KeyCite citing references available

| Code of Federal Regulations |
| Title 16. Commercial Practices |
| Chapter I. Federal Trade Commission |
| Subchapter D. Trade Regulation Rules |
| Part 436. Disclosure Requirements and Prohibitions Concerning Franchising (Refs & Annos) |
| Subpart A. Definitions |

16 C.F.R. § 436.1

§ 436.1 Definitions.

Effective: July 1, 2007

Currentness

Unless stated otherwise, the following definitions apply throughout part 436:

(a) Action includes complaints, cross claims, counterclaims, and third-party complaints in a judicial action or proceeding, and their equivalents in an administrative action or arbitration.

(b) Affiliate means an entity controlled by, controlling, or under common control with, another entity.

(c) Confidentiality clause means any contract, order, or settlement provision that directly or indirectly restricts a current or former franchisee from discussing his or her personal experience as a franchisee in the franchisor's system with any prospective franchisee. It does not include clauses that protect franchisor's trademarks or other proprietary information.

(d) Disclose, state, describe, and list each mean to present all material facts accurately, clearly, concisely, and legibly in plain English.

(e) Financial performance representation means any representation, including any oral, written, or visual representation, to a prospective franchisee, including a representation in the general media, that states, expressly or by implication, a specific level or range of actual or potential sales, income, gross profits, or net profits. The term includes a chart, table, or mathematical calculation that shows possible results based on a combination of variables.

(f) Fiscal year refers to the franchisor's fiscal year.

SPA 37

(g) Fractional franchise means a franchise relationship that satisfies the following criteria when the relationship is created:

(1) The franchisee, any of the franchisee's current directors or officers, or any current directors or officers of a parent or affiliate, has more than two years of experience in the same type of business; and

(2) The parties have a reasonable basis to anticipate that the sales arising from the relationship will not exceed 20% of the franchisee's total dollar volume in sales during the first year of operation.

(h) Franchise means any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

(1) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

(2) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and

(3) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

(i) Franchisee means any person who is granted a franchise.

(j) Franchise seller means a person that offers for sale, sells, or arranges for the sale of a franchise. It includes the franchisor and the franchisor's employees, representatives, agents, subfranchisors, and third-party brokers who are involved in franchise sales activities. It does not include existing franchisees who sell only their own outlet and who are otherwise not engaged in franchise sales on behalf of the franchisor.

(k) Franchisor means any person who grants a franchise and participates in the franchise relationship. Unless otherwise stated, it includes subfranchisors. For purposes of this definition, a "subfranchisor" means a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance.

(l) Leased department means an arrangement whereby a retailer licenses or otherwise permits a seller to conduct business from the retailer's location where the seller purchases no goods, services, or commodities directly or indirectly from the

retailer, a person the retailer requires the seller to do business with, or a retailer-affiliate if the retailer advises the seller to do business with the affiliate.

(m) Parent means an entity that controls another entity directly, or indirectly through one or more subsidiaries.

(n) Person means any individual, group, association, limited or general partnership, corporation, or any other entity.

(o) Plain English means the organization of information and language usage understandable by a person unfamiliar with the franchise business. It incorporates short sentences; definite, concrete, everyday language; active voice; and tabular presentation of information, where possible. It avoids legal jargon, highly technical business terms, and multiple negatives.

(p) Predecessor means a person from whom the franchisor acquired, directly or indirectly, the major portion of the franchisor's assets.

(q) Principal business address means the street address of a person's home office in the United States. A principal business address cannot be a post office box or private mail drop.

(r) Prospective franchisee means any person (including any agent, representative, or employee) who approaches or is approached by a franchise seller to discuss the possible establishment of a franchise relationship.

(s) Required payment means all consideration that the franchisee must pay to the franchisor or an affiliate, either by contract or by practical necessity, as a condition of obtaining or commencing operation of the franchise. A required payment does not include payments for the purchase of reasonable amounts of inventory at bona fide wholesale prices for resale or lease.

(t) Sale of a franchise includes an agreement whereby a person obtains a franchise from a franchise seller for value by purchase, license, or otherwise. It does not include extending or renewing an existing franchise agreement where there has been no interruption in the franchisee's operation of the business, unless the new agreement contains terms and conditions that differ materially from the original agreement. It also does not include the transfer of a franchise by an existing franchisee where the franchisor has had no significant involvement with the prospective transferee. A franchisor's approval or disapproval of a transfer alone is not deemed to be significant involvement.

(u) Signature means a person's affirmative step to authenticate his or her identity. It includes a person's handwritten signature, as well as a person's use of security codes, passwords, electronic signatures, and similar devices to authenticate his or her identity.

(v) Trademark includes trademarks, service marks, names, logos, and other commercial symbols.

(w) Written or in writing means any document or information in printed form or in any form capable of being preserved in tangible form and read. It includes: type-set, word processed, or handwritten document; information on computer disk or CD–ROM; information sent via email; or information posted on the Internet. It does not include mere oral statements.

SOURCE: 72 FR 15544, March 30, 2007, unless otherwise noted.

AUTHORITY: 15 U.S.C. 41–58.

Notes of Decisions (7)

Current through June 29, 2022, 87 FR 38673, except for 40 CFR § 52.220, which is current through May 6, 2022. Some sections may be more current. See credits for details.

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite cautionary citing references available

Unconstitutional or PreemptedValidity Called into Doubt by Abramson v. Marriott Ownership Resorts, Inc., C.D.Cal., Jan. 04, 2016

KeyCite Yellow Flag - Negative Treatment

Proposed Legislation

| United States Code Annotated |
| Title 28. Judiciary and Judicial Procedure (Refs & Annos) |
| Part IV. Jurisdiction and Venue (Refs & Annos) |
| Chapter 85. District Courts; Jurisdiction (Refs & Annos) |

28 U.S.C.A. § 1332

## § 1332. Diversity of citizenship; amount in controversy; costs [Statutory Text & Notes of Decisions subdivisions I to V]

Currentness

<Notes of Decisions for 28 USCA § 1332 are displayed in multiple documents.>

**(a)** The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between--

**(1)** citizens of different States;

**(2)** citizens of a State and citizens or subjects of a foreign state, except that the district courts shall not have original jurisdiction under this subsection of an action between citizens of a State and citizens or subjects of a foreign state who are lawfully admitted for permanent residence in the United States and are domiciled in the same State;

**(3)** citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

**(4)** a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

**(b)** Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

SPA 41

**(c)** For the purposes of this section and section 1441 of this title--

**(1)** a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and the State or foreign state where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of--

**(A)** every State and foreign state of which the insured is a citizen;

**(B)** every State and foreign state by which the insurer has been incorporated; and

**(C)** the State or foreign state where the insurer has its principal place of business; and

**(2)** the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.

**(d)(1)** In this subsection--

**(A)** the term "class" means all of the class members in a class action;

**(B)** the term "class action" means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

**(C)** the term "class certification order" means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

**(D)** the term "class members" means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

**(2)** The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which--

**(A)** any member of a class of plaintiffs is a citizen of a State different from any defendant;

**(B)** any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

**(C)** any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

**(3)** A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of--

**(A)** whether the claims asserted involve matters of national or interstate interest;

**(B)** whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

**(C)** whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

**(D)** whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

**(E)** whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

**(F)** whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

**(4)** A district court shall decline to exercise jurisdiction under paragraph (2)--

**(A)(i)** over a class action in which--

**(I)** greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

**(II)** at least 1 defendant is a defendant--

**(aa)** from whom significant relief is sought by members of the plaintiff class;

**(bb)** whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

**(cc)** who is a citizen of the State in which the action was originally filed; and

**(III)** principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

**(ii)** during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

**(B)** two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

**(5)** Paragraphs (2) through (4) shall not apply to any class action in which--

**(A)** the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

**(B)** the number of members of all proposed plaintiff classes in the aggregate is less than 100.

**(6)** In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

**(7)** Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

**(8)** This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

**(9)** Paragraph (2) shall not apply to any class action that solely involves a claim--

**(A)** concerning a covered security as defined under 16(f)(3)[1] of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)[2]) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

**(B)** that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

**(C)** that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

**(10)** For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

**(11)(A)** For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

**(B)(i)** As used in subparagraph (A), the term "mass action" means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

**(ii)** As used in subparagraph (A), the term "mass action" shall not include any civil action in which--

**(I)** all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

**(II)** the claims are joined upon motion of a defendant;

**(III)** all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

**(IV)** the claims have been consolidated or coordinated solely for pretrial proceedings.

**(C)(i)** Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

**(ii)** This subparagraph will not apply--

**(I)** to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

**(II)** if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

**(D)** The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.

**(e)** The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico.

### CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 930; July 26, 1956, c. 740, 70 Stat. 658; Pub.L. 85-554, § 2, July 25, 1958, 72 Stat. 415; Pub.L. 88-439, § 1, Aug. 14, 1964, 78 Stat. 445; Pub.L. 94-583, § 3, Oct. 21, 1976, 90 Stat. 2891; Pub.L. 100-702, Title II, §§ 201(a), 202(a), 203(a), Nov. 19, 1988, 102 Stat. 4646; Pub.L. 104-317, Title II, § 205(a), Oct. 19, 1996, 110 Stat. 3850; Pub.L. 109-2, § 4(a), Feb. 18, 2005, 119 Stat. 9; Pub.L. 112-63, Title I, §§ 101, 102, Dec. 7, 2011, 125 Stat. 758.)

**§ 1332. Diversity of citizenship; amount in controversy; costs..., 28 USCA § 1332**

Notes of Decisions (980)

Footnotes

1
So in original. Reference to "16(f)(3)" probably should be preceded by "section".

2
So in original. Probably should be "77p(f)(3)".

28 U.S.C.A. § 1332, 28 USCA § 1332
Current through P.L. 117-154. Some statute sections may be more current, see credits for details

**End of Document**          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

SPA 47

KeyCite citing references available

| United States Code Annotated |
| Federal Rules of Civil Procedure for the United States District Courts (Refs & Annos) |
| Title VI. Trials |

Federal Rules of Civil Procedure Rule 41

## Rule 41. Dismissal of Actions

Currentness

**(a) Voluntary Dismissal.**

    **(1)** *By the Plaintiff.*

        **(A)** *Without a Court Order.* Subject to Rules 23(e), 23.1(c), 23.2, and 66 and any applicable federal statute, the plaintiff may dismiss an action without a court order by filing:

            **(i)** a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

            **(ii)** a stipulation of dismissal signed by all parties who have appeared.

        **(B)** *Effect.* Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

    **(2)** *By Court Order; Effect.* Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

**(b) Involuntary Dismissal; Effect.** If the plaintiff fails to prosecute or to comply with these rules or a court order, a

defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule--except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19--operates as an adjudication on the merits.

**(c) Dismissing a Counterclaim, Crossclaim, or Third-Party Claim.** This rule applies to a dismissal of any counterclaim, crossclaim, or third-party claim. A claimant's voluntary dismissal under Rule 41(a)(1)(A)(i) must be made:

**(1)** before a responsive pleading is served; or

**(2)** if there is no responsive pleading, before evidence is introduced at a hearing or trial.

**(d) Costs of a Previously Dismissed Action.** If a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court:

**(1)** may order the plaintiff to pay all or part of the costs of that previous action; and

**(2)** may stay the proceedings until the plaintiff has complied.

**CREDIT(S)**

(Amended December 27, 1946, effective March 19, 1948; January 21, 1963, effective July 1, 1963; February 28, 1966, effective July 1, 1966; December 4, 1967, effective July 1, 1968; March 2, 1987, effective August 1, 1987; April 30, 1991, effective December 1, 1991; April 30, 2007, effective December 1, 2007.)

**ADVISORY COMMITTEE NOTES**

1937 Adoption

**Note to Subdivision (a).** Compare Ill.Rev.Stat. (1937) c. 110, § 176, and *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 26.

Provisions regarding dismissal in such statutes as U.S.C., Title 8, § 164 [see 1329] (Jurisdiction of district courts in immigration cases) and U.S.C., Title 31, § 232 [now 3730] (Liability of persons making false claims against United States; suits) are preserved by paragraph (1).

**Note to Subdivision (b).** This provides for the equivalent of a nonsuit on motion by the defendant after the completion of the presentation of evidence by the plaintiff. Also, for actions tried without a jury, it provides the equivalent of the directed verdict practice for jury actions which is regulated by Rule 50.

Rule 41. Dismissal of Actions, FRCP Rule 41

**1946 Amendment**

**Note. Subdivision (a).** The insertion of the reference to Rule 66 correlates Rule 41(a)(1) with the express provisions concerning dismissal set forth in amended Rule 66 on receivers.

The change in Rule 41(a)(1)(i) gives the service of a motion for summary judgment by the adverse party the same effect in preventing unlimited dismissal as was originally given only to the service of an answer. The omission of reference to a motion for summary judgment in the original rule was subject to criticism. 3 *Moore's Federal Practice,* 1938, 3037-3038, n. 12. A motion for summary judgment may be forthcoming prior to answer, and if well taken will eliminate the necessity for an answer. Since such a motion may require even more research and preparation than the answer itself, there is good reason why the service of the motion, like that of the answer, should prevent a voluntary dismissal by the adversary without court approval.

The word "generally" has been stricken from Rule 41(a)(1)(ii) in order to avoid confusion and to conform with the elimination of the necessity for special appearance by original Rule 12(b).

**Subdivision (b).** In some cases tried without a jury, where at the close of plaintiff's evidence the defendant moves for dismissal under Rule 41(b) on the ground that plaintiff's evidence is insufficient for recovery, the plaintiff's own evidence may be conflicting or present questions of credibility. In ruling on the defendant's motion, questions arise as to the function of the judge in evaluating the testimony and whether findings should be made if the motion is sustained. Three circuits hold that as the judge is the trier of the facts in such a situation his function is not the same as on a motion to direct a verdict, where the jury is the trier of the facts, and that the judge in deciding such a motion in a non-jury case may pass on conflicts of evidence and credibility, and if he performs that function of evaluating the testimony and grants the motion on the merits, findings are required. *Young v. United States,* C.C.A.9, 1940, 111 F.2d 823; *Gary Theatre Co. v. Columbia Pictures Corporation,* C.C.A.7, 1941, 120 F.2d 891; *Bach v. Friden Calculating Machine Co., Inc.,* C.C.A.6, 1945, 148 F.2d 407. Cf. *Mateas v. Fred Harvey, a Corporation,* C.C.A.9, 1945, 146 F.2d 989. The Third Circuit has held that on such a motion the function of the court is the same as on a motion to direct in a jury case, and that the court should only decide whether there is evidence which would support a judgment for the plaintiff, and therefore, findings are not required by Rule 52. *Federal Deposit Insurance Corp. v. Mason,* C.C.A.3, 1940, 115 F.2d 548; *Schad v. Twentieth Century-Fox Film Corp.,* C.C.A.3, 1943, 136 F.2d 991. The added sentence in Rule 41(b) incorporates the view of the Sixth, Seventh and Ninth Circuits. See also 3 *Moore's Federal Practice,* 1938, Cum.Supplement § 41.03, under "Page 3045"; Commentary, *The Motion to Dismiss in Non-Jury Cases,* 1946, 9 Fed.Rules Serv., Comm.Pg. 41b.14.

**1963 Amendment**

Under the present text of the second sentence of this subdivision, the motion for dismissal at the close of the plaintiff's evidence may be made in a case tried to a jury as well as in a case tried without a jury. But, when made in a jury-tried case, this motion overlaps the motion for a directed verdict under Rule 50(a), which is also available in the same situation. It has been held that the standard to be applied in deciding the Rule 41(b) motion at the close of the plaintiff's evidence in a jury-tried case is the same as that used upon a motion for a directed verdict made at the same stage; and, just as the court need not make findings pursuant to Rule 52(a) when it directs a verdict, so in a jury-tried case it may omit these findings in granting the Rule 41(b) motion. See generally *O'Brien v. Westinghouse Electric Corp.,* 293 F.2d 1, 5-10 (3d Cir. 1961).

As indicated by the discussion in the *O'Brien* case, the overlap has caused confusion. Accordingly, the second and third sentences of Rule 41(b) are amended to provide that the motion for dismissal at the close of the plaintiff's evidence shall

apply only to nonjury cases (including cases tried with an advisory jury). Hereafter the correct motion in jury-tried cases will be the motion for a directed verdict. This involves no change of substance. It should be noted that the court upon a motion for a directed verdict may in appropriate circumstances deny that motion and grant instead a new trial, or a voluntary dismissal without prejudice under Rule 41(a)(2). See 6 *Moore's Federal Practice* ¶59.08[5] (2d ed. 1954); *cf. Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 217, 67 S.Ct. 752, 91 L.Ed. 849 (1947).

The first sentence of Rule 41(b), providing for dismissal for failure to prosecute or to comply with the Rules or any order of court, and the general provisions of the last sentence remain applicable in jury as well as nonjury cases.

The amendment of the last sentence of Rule 41(b) indicates that a dismissal for lack of an indispensable party does not operate as an adjudication on the merits. Such a dismissal does not bar a new action, for it is based merely "on a plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim." See *Costello v. United States,* 365 U.S. 265, 284-288, 81 S.Ct. 534, 5 L.Ed.2d 551 & n. 5 (1961); *Mallow v. Hinde,* 12 Wheat. (25 U.S.) 193, 6 L.Ed. 599 (1827); Clark, *Code Pleading* 602 (2d ed. 1947); *Restatement of Judgments* § 49, comm. a, b (1942). This amendment corrects an omission from the rule and is consistent with an earlier amendment, effective in 1948, adding "the defense of failure to join an indispensable party" to clause (1) of Rule 12(h).

### 1966 Amendment

The terminology is changed to accord with the amendment of Rule 19. See that amended rule and the Advisory Committee's Note thereto.

### 1968 Amendment

The amendment corrects an inadvertent error in the reference to amended Rule 23.

### 1987 Amendment

The amendment is technical. No substantive change is intended.

### 1991 Amendment

Language is deleted that authorized the use of this rule as a means of terminating a non-jury action on the merits when the plaintiff has failed to carry a burden of proof in presenting the plaintiff's case. The device is replaced by the new provisions of Rule 52(c), which authorize entry of judgment against the defendant as well as the plaintiff, and earlier than the close of the case of the party against whom judgment is rendered. A motion to dismiss under Rule 41 on the ground that a plaintiff's evidence is legally insufficient should now be treated as a motion for judgment on partial findings as provided in Rule 52(c).

### 2007 Amendment

The language of Rule 41 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic

only.

When Rule 23 was amended in 1966, Rules 23.1 and 23.2 were separated from Rule 23. Rule 41(a)(1) was not then amended to reflect the Rule 23 changes. In 1968 Rule 41(a)(1) was amended to correct the cross-reference to what had become Rule 23(e), but Rules 23.1 and 23.2 were inadvertently overlooked. Rules 23.1 and 23.2 are now added to the list of exceptions in Rule 41(a)(1)(A). This change does not affect established meaning. Rule 23.2 explicitly incorporates Rule 23(e), and thus was already absorbed directly into the exceptions in Rule 41(a)(1). Rule 23.1 requires court approval of a compromise or dismissal in language parallel to Rule 23(e) and thus supersedes the apparent right to dismiss by notice of dismissal.

Notes of Decisions (2006)

Fed. Rules Civ. Proc. Rule 41, 28 U.S.C.A., FRCP Rule 41
Including Amendments Received Through 7-1-22

**End of Document** © 2022 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.   5

| | Statement Date |
|---|---|
| | 13-Apr-22 |
| | **Balance Currently Due** |
| | $0.00 |
| | **Case #** |
| | 01-20-0007-2506-2-SD |

**Pay PIN**: 11240207

# Detail Invoice/Statement

Norman  Leon, Esq.
DLA Piper, LLP (US)
444 West Lake Street
Suite 900
Chicago, IL 60606-1293

Representing: **Coverall North America, Inc.**

Re: Quincy Reeves
Vs.
Coverall North America, Inc.

| Statement Date | Case # | Previous Balance | Credits/Cancellations | New Charges | Statement Balance |
|---|---|---|---|---|---|
| 13-Apr-22 | 01-20-0007-2506 | $0.00 | $0.00 | $0.00 | $0.00 |

| Bill Line Date *Transaction Date* | Bill Line # | Description | Amount | Credits/ Cancellations | Balance | Due Date |
|---|---|---|---|---|---|---|
| 28-Oct-2020 | 12836975 | Your Share of the Neutral Compensation Deposit covering 18 hrs. Hearing, 8 hrs. Post-Hearing, 4 hrs. Award Prep Time and Writing Final Award & 6 hrs. Travel Time due on or before March 19, 2021 | $4,500.00 | | $0.00 | 19-Mar-2021 |
| *28-Dec-2020* | | Cancellation | | $4,500.00 | | |
| 28-Oct-2020 | 12836972 | Your Share of the Neutral Compensation Deposit covering .5 hr. Preliminary Hearing, 10 hrs. Motion Practice/Discovery Issues & 4 hrs. Pre-Hearing Study due on or before November 10, 2020 | $1,812.50 | | $0.00 | 10-Nov-2020 |
| *10-Dec-2020* | | Check (#404017) | | $1,812.50 | | |
| *28-Dec-2020* | | Cancellation | | $900.00 | | |
| *28-Dec-2020* | | Refund | | - $900.00 | | |
| 21-Oct-2020 | 12832552 | Your Share of the Neutral Compensation Deposit covering 6 Hours of  preliminary Matters | $750.00 | | $0.00 | 21-Oct-2020 |
| *10-Dec-2020* | | Check (#404017) | | $750.00 | | |

| Statement Balance | Balance Currently Due |
|---|---|
| $0.00 | $0.00 |

**Corporate Address and Tax ID**: American Arbitration Association, 120 Broadway, 21st Floor, New York, NY 10271, EIN: 13-0429745

SPA 53

Page 1 of 2

| Statement Date |
|---|
| 13-Apr-22 |
| **Balance Currently Due** |
| $0.00 |
| **Case #** |
| 01-20-0007-2506-2-SD |

**Pay PIN**: 11240207

# Payment Options

## Paying by Credit Card or eCheck
To pay with a credit card or eCheck online, go to www.adr.org, click on "*File or Access your Case*" and then select "*Quick Pay an Invoice*" and use this **Pay PIN**: **11240207**.

## Wire Transfer
As information transmitted by the bank is often truncated due to limited space, please email your reference information (Case #/Bill Line #/Program #/Party Name) with the date and amount of your wire, to ensure that your payment is credited promptly and correctly (e.g. 011400021841 P1 or #1234567 P2 or EDU1234). Please email as follows:

For active cases: send to your AAA case representative and corpfinance@adr.org
For new filings (where your case number is not known): send to casefiling@adr.org and corpfinance@adr.org

FOR WIRES / ACH / EFT
        **Name of Bank:** Wells Fargo Bank
        **Address:** 150 East 42nd Street, 24th FL., New York, NY 10017, USA
        **Account Name:** AAA/American Arbitration Association
        **Account Number:** 2000017952068
        **ABA/Transit Number:** 121000248
        **Reference:** Case # and Bill Line #/Party Name; or Program # (as applicable)
        **Swift Code/BIC:** WFBIUS6S

Note: Please take steps to ensure that your bank does in fact wire the entire amount to our account. From time to time, certain banks will keep a portion of the wire transfer for their own service fee, leaving a balance due to the AAA/ICDR.

## Paying by Check
*Payment by mailing checks is strongly discouraged due to significant disruptions in mail delivery as a result of COVID-19.*

In the event that this is the only way you are able to make a payment, please return this page with your payment (please indicate the Case # on the check) to:

    1301 Atwood Avenue
    Suite 211N
    Johnston, RI 02919
    Telephone: (866)293-4053
    Fax: (866)644-0234